**James R. KING, Plaintiff,**

v.

**STATE BOARD OF ELECTIONS, David E. Murray, Lawrence E. Johnson, Hannelore Huisman, Judith Jones, Langdon D. Neal, Theresa M. Petrone, and Wanda Rednour, Defendants,**

and

**United States of America, Bobby Rush, Timuel Black, Al Johnson, Elvira Carrizales, Neomi Hernandez, and The Chicago Urban League, Defendant Intervenors.**

No. 95 C 827.

United States District Court,
N.D. Illinois,
Eastern Division.

March 15, 1996.

---

**586**

Douglas Edward Markham, Houston, TX, for Plaintiff.

Joan Cagen Laser, U.S. Attys. Office, Judson H. Miner, Miner, Barnhill & Galland, Maria Valdez, Mexican Amer. Legal Defense & Educ. Fund, Clyde Murphy, Chicago Lawyers' Committee for Civil Rights, Martha J. Avery, Robins, Kaplan, Miller & Ciresi, Mark Stephen Grotefeld, Provizer, Phillips, Grotefeld & Denenberg, P.C., Charles Frank Marino, David M. Marino, Chicago, IL, Brenda Wright, Lawyers' Committee for Civil Rights, Washington, DC, for Intervenors.

Limo T. Cherian, Mitchell Bruce Katten, O'Rourke & Griffin, Chicago, IL, for Defendants.

Before KANNE, Circuit Judge, and NORGLE and COAR, District Judges.

## *MEMORANDUM OPINION AND ORDER*

Plaintiff, James R. King ("King"), claims that the configuration of the Illinois Fourth Congressional District violates the Fourteenth Amendment. To address this claim, this court must review the history of the current district map and resolve the unusual procedural issues that accompany King's lawsuit.

Because the Illinois General Assembly failed to reapportion Illinois' legislative districts following the issuance of the 1990 census report, that task fell to an earlier panel of this court by default.[1] *See Hastert v. State Bd. of Elections,* 777 F.Supp. 634, 641 (N.D.Ill.1991) (hereinafter *"Hastert"*). On November 6, 1991, the *Hastert* court issued an order reapportioning Illinois' twenty (20) congressional seats. Through this order, the *Hastert* court created a "majority-minority" Hispanic congressional district for the first time in Illinois history. The situs of this Hispanic majority district is Illinois' Fourth Congressional District, which is located in Cook County and the City of Chicago.[2] Since November 6, 1991, the United States Supreme Court has issued two course-altering opinions concerning congressional reapportionment and the Equal Protection Clause of the Fourteenth Amendment. *See Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). In addition, two congressional elections have been held; in both elections, the electorate of the Fourth Congressional District sent a Hispanic representative to Congress.

In February 1995, King, a resident of the Fourth Congressional District, filed the instant lawsuit challenging the constitutionality of the Hispanic majority district adopted in *Hastert.*[3] King contends that the borders of

---

**1.** Article 4, § 3(b) of the Illinois Constitution provides in pertinent part:

In the year following each Federal decennial census year, the General Assembly shall redistrict the Legislative Districts ... [by] June 30 of that year....

**2.** A map of the Fourth Congressional District is attached as Appendix Exhibit A.

**3.** William J. Kelly and PAC for Middle America originally joined King as plaintiffs in this lawsuit. Kelly, a resident of Illinois' First Congressional

the Fourth Congressional District were drawn predominately on the basis of race and without a compelling state interest to justify this racially-based classification. He also opposes the district's current configuration on moral grounds. King thus argues that the configuration of the Fourth Congressional District approved in *Hastert* violates the Equal Protection Clause of the Fourteenth Amendment. King's lawsuit compels this court to again enter the thicket of congressional redistricting. *See Hastert,* 777 F.Supp. at 641 (citation omitted). More specifically, this court must determine whether the *court-ordered* Hispanic majority district adopted in *Hastert* passes constitutional muster under the Supreme Court's host recent equal protection jurisprudence.

### I. Relevant Procedural History

Following the filing of King's lawsuit, this court permitted Congressman Bobby Rush (Dem.–IL, 1st Dist.), Timuel Black, Al Johnson, Elvira Carrizales, Neomi Hernandez, the Chicago Urban League, and the United States Department of Justice ("DOJ") to intervene as defendants under Federal Rules of Civil Procedure 24(a) and (b).[4] In addition, the court permitted the Democratic National Committee to participate *amicus curiae.*

On August 15, 1995, King filed a motion for a preliminary injunction seeking to enjoin the Illinois Congressional primary and general elections presently scheduled for March 19, 1996, and November 5, 1996, respectively. King predicated his request for a preliminary injunction on the alleged constitutional deprivation articulated in his complaint; namely,

that the *Hastert* court's configuration of the Fourth Congressional District on the basis of race violated his rights under the Fourteenth Amendment to participate in a "color-blind election process." Pursuant to Rule 65(a)(2), this court consolidated the hearing on King's preliminary injunction motion with the three day trial conducted December 13–15, 1995, on the merits of King's complaint. *See Fed. R.Civ.P. 65(a)(2).* Since many of the arguments advanced at trial by King either directly or indirectly challenged or implicated factual findings and legal conclusions made by the *Hastert* court, this court first had to resolve several procedural issues concerning the relationship between this litigation and the *Hastert* litigation. Two issues predominated: first, whether and to what extent the parties are bound by the *Hastert* court's findings of fact; and second, the standard by which this court would review the *Hastert* court's conclusions of law.

### A. Standards Governing the *Hastert* court's Findings of Fact

#### 1. Rule 60(b)

█ Defendant State Board of Elections ("SBOE") and defendant-intervenor DOJ argued that King's lawsuit should be considered an attempt to modify or vacate the *Hastert* court's reapportionment order since it essentially attacked the factual findings and legal conclusions of the *Hastert* opinion. Based upon this characterization, the SBOE and DOJ maintained that King's lawsuit should have been transferred to the *Hastert* panel pursuant to Local General Rule .2.21 D(8).[5] If the case had been transferred, King would have had to petition the *Hastert*

---

District, challenged the *Hastert* court's reapportionment of the First Congressional District—a "super-majority" African–American congressional district—on the same grounds that King challenges the reapportionment of the Fourth Congressional District. Kelly and PAC for Middle America voluntarily dismissed their claims several months prior to trial.

**4.** *See Pac for Middle America v. State Board of Elections,* No. 95 C 827, 1995 WL 571893 (N.D.Ill. Sept.20, 1995) (three judge panel); Minute Order dated Nov. 8, 1995. Rush, Johnson, Hernandez, and the Chicago Urban League all participated in the *Hastert* litigation.

**5.** The Honorable Michael S. Kanne, Charles R. Norgle, Sr., and Suzanne B. Conlon presided over the *Hastert* litigation. Local General Rule 2.21 D provides:

**Direct Assignment of Cases to the Calendar of a Judge**
 In each of the following instances, the assignment clerk shall assign the case to a judge in the manner specified:
 \* \* \* \* \* \*
(8) *Cases filed to enforce, modify, or vacate judgment*
 Proceedings to enforce, modify, or vacate a judgment should be brought within the case in which the judgment was entered. If a separate case is filed for the purpose of enforcing, modi-

court to reopen those proceedings and permit him to intervene. The *Hastert* court, in turn, would have considered King's challenges to its November 1991 reapportionment order under Rule 60(b)(5) or (b)(6).[6] Proceeding under Rule 60(b) would have been a daunting task, since "relief from a judgment under Rule 60(b) is an extraordinary remedy reserved for the exceptional case."[7] *See Camp v. Gregory,* 67 F.3d 1286, 1290 (7th Cir.1995).

■ This court, which includes two of the three judges who presided over the *Hastert* case, declined to transfer King's case as suggested by the SBOE and DOJ for three reasons. First, the doctrine of the law of the case mandated this court's rejection of the SBOE and DOJ argument. The law of the case doctrine typically provides that "when a court decides upon a rule of law, that decision should continue to govern the same is-

---

fying, or vacating a judgment entered in a case previously filed in this District, the case shall be assigned directly to the judge to whom the earlier case was assigned.

**6.** Rule 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment....

*Fed.R.Civ.P. 60(b)(5), (b)(6).* Rule 60(b) also provides that a court may "entertain an independent action to relieve a party from a judgment, order or proceeding." Resort to an independent action—an action in equity to obtain relief from a judgment—may only be had rarely and under exceptional circumstances. *11 Wright & Miller, Federal Practice and Procedure: Civil.2d § 2868,* at 397–98 (1995). An independent action in equity has the following "indispensable" elements: (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law. *Id.* at 397 & n. 5 (citations omitted). King's action does not contain all of these indispensable elements and thus cannot be characterized as an independent action in equity. *See, e.g., Rader v. Cliburn,* 476 F.2d 182, 184 (6th Cir.1973) (lawsuit which alleged that a federal judge failed to consider a relevant state statute when he ordered the reapportionment of the Macon County, Tennessee's Board of Education Districts two years earlier was not a case of unusual or exceptional circumstances meriting relief as an independent suit in equity).

**7.** Federal Rules of Civil Procedure 59(e) and 60(b) both govern post-judgment motions attacking the merits of a district court's decisions. *See Russell v. Delco Remy Div. of Gen. Motors,* 51 F.3d 746, 749 (7th Cir.1995).

Motions for Reconsideration under Rule 59(e) permit a court to "correct manifest errors of law or fact or to present newly discovered evidence." *Id. (citing Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990)); *Keene Corp. v. International Fidelity Ins. Co.,* 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd* 736 F.2d 388 (7th Cir.1984). In addition, a motion for reconsideration is appropriate where a controlling or significant change in the law or facts has occurred since the issue was submitted to the court. *Waunakee,* 906 F.2d at 1191 (citation omitted). The Rule permits a court to correct its own errors, thereby avoiding the expenses and burdens of an appeal. *Russell,* 51 F.3d at 749. A Rule 59(e) motion must be filed within ten (10) days of the judgment. *Fed.R.Civ.P. 59(e); Russell,* 51 F.3d at 749; *Helm v. Resolution Trust Corp.,* 43 F.3d 1163, 1166–67 (7th Cir.1995) (a motion to alter or amend a judgment served more than ten days after a final judgment is treated as a Rule 60(b) motion).

Rule 60(b) "enables a court to grant relief from a judgment under the particular circumstances listed in the text of the rule." *Russell,* 51 F.3d at 749. It was designed to "address mistakes attributable to special circumstances and not merely to erroneous applications of law." *Id.* It affords extraordinary relief and is application is limited to extraordinary circumstances. *Id.; Harold Washington Party v. Cook Co., Ill. Democratic Party,* 984 F.2d 875, 879 (7th Cir.), *cert. denied* 510 U.S. 825, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); *Bally Export Corp. v. Balicar, Ltd.,* 804 F.2d 398, 400 (7th Cir.1986). It too permits a court to correct only "manifest errors of law or fact." *See United States ex rel. Felder v. Gramley,* 893 F.Supp. 768, 773 (N.D.Ill.1995); *Jones v. Banks,* 892 F.Supp. 988, 989 (N.D.Ill.1995) (citation omitted).

Rules 59(e) and 60(b) thus provide some overlapping relief, albeit the overlap is imperfect. *Russell,* 51 F.3d at 749. "A court should correct a manifest error of law under Rule 59(e).... Rule 60(b), on the other hand, is not an appropriate vehicle for addressing simple legal error; otherwise, a party could circumvent the ordinary time limitation for filing a notice of appeal." *Id.* The correction of mistakes under Rule 60(b) is left to the district court's sound discretion, but that discretion must be exercised with a view to the differences inherent in the two rules. *Id.*

sues in subsequent stages in the same case." *Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir.1994) (*quoting Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)). The doctrine applies not only to the prior decisions of the same court, but also to prior decisions of a coordinate court in the same case. *Id.* (*citing Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–18, 108 S.Ct. 2166, 2177–79, 100 L.Ed.2d 811 (1988)). In this context, the doctrine of the law of the case functions like the doctrine governing reconsideration; that is, "a court will ordinarily not reconsider its own decision made at an earlier stage of the trial or on a prior appeal, absent clear and convincing reasons to reexamine the prior ruling." *See Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991) (*quoting Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir.1982), *cert. denied* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983)). Thus, when a court is asked to change a prior decision in its own case or in the case of a coordinate court, the law of the case doctrine permits it to avoid reexamining the prior decision "unless powerful reasons are given for doing so." *Id.*

In this case, King filed a petition for the appointment of a three judge panel pursuant to 28 U.S.C. section 2284(a) shortly after filing his complaint.[8] The SBOE agreed that a three judge panel was appropriate but argued that the three judges who presided over the *Hastert* litigation should be reappointed since King's complaint sought "to modify" that court's redistricting order. (*See* SBOE Resp. Mem., at ¶¶ 4–5). In accordance with 28 U.S.C. section 2284(b)(1), the petition was transferred to the Honorable Richard A. Posner, Chief Judge of the Seventh Circuit Court of Appeals, for decision.[9] Judge Pos-

ner appointed the present panel, and thereby rejected the SBOE's request for assignment of the case to the *Hastert* court.

Second, neither the SBOE nor DOJ established that Local Rule 2.21 D(8) applied to the unique circumstances of King's complaint. The purpose of Local Rule 2.21 D(8) appears to be three-fold: to prevent forum or judge shopping; to ensure continuity of decisions; and to promote judicial economy. Given these purposes, it is axiomatic that when a court enters a judgment resolving a dispute among certain parties, the same court must preside over any secondary action brought by one of the parties to enforce, modify or vacate that judgment. King, however, does not fall within the parameters of this axiom. He was neither a party to nor in privity with any party to the *Hastert* proceeding, and thus lacked standing to petition the *Hastert* court under Rule 60(b) for an order vacating or modifying its judgment order. *See Fed.R.Civ.P.R. 60(b); National Acceptance Co. of Am., Inc. v. Frigidmeats, Inc.*, 627 F.2d 764, 766 (7th Cir.1980) ("[i]t is well settled that ... 'one who was not a party lacks standing to make a 60(b) motion' ") (*quoting 11 Wright & Miller, Federal Practice and Procedure § 2865*, at 225–26 (1973)). In addition, there is no evidence that he engaged in any impermissible judge shopping, which would have been a particularly fruitless endeavor since Judge Posner appointed two of the three *Hastert* judges to preside over this case. Similarly, the interests of judicial economy were not compelling as King alleged that both the governing law and the relevant facts had changed since the *Hastert* court issued its reapportionment order. Thus, the law of the case doctrine notwithstanding, the DOJ and SBOE failed to establish that King's complaint was eligi-

---

**8.** Section 2284(a) provides that "[a] district court of three judges shall be convened when ... an action is filed challenging the constitutionality of the apportionment of congressional districts...." *28 U.S.C. § 2284(a).*

**9.** Section 2284 states in pertinent part:

(b) In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows:

(1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding.
*28 U.S.C. § 2284(b)(1).*

ble for reassignment under Local Rule 2.21 D(8).

Finally, the *Hastert* court did not retain jurisdiction to hear and decide future constitutional challenges to its reapportionment order. The DOJ argued that the *Hastert* court implicitly retained jurisdiction to enforce or modify its judgment in light of changed circumstances, but the authority it cited concerned the modification of injunctive relief. *See System Fed'n No. 91, Ry. Emp. Dept. AFL–CIO v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) (district court abused its discretion in refusing to modify consent decree that enjoined a number of specific discriminatory acts); *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (court in equity has power to modify an injunction to adapt to changed conditions, even where the injunction was entered by consent decree). This authority is inapposite as the *Hastert* court issued its reapportionment order pursuant to Section 2 of the Voting Rights Act. To that end, the *Hastert* court ordered that the court-ordered redistricting plan "shall govern the nomination and election of members of the House of Representatives from the State of Illinois, effective with respect to the 1992 primary and continuing until Illinois congressional districts are reapportioned in accordance with law." *Hastert,* 777 F.Supp. at 662. The *Hastert* court thus not only declined to retain jurisdiction to consider subsequent non-party challenges to its reap-

portionment order but, equally important, it conditionally limited the duration of its order.[10] *See Jackson v. DeSoto Parish Sch. Bd.,* 585 F.2d 726, 730 n. 1 (5th Cir.1978) ("[w]e note ... that in reapportionment, unlike school desegregation and institutional reform cases, the court's jurisdiction is not continuing, and the plan, once adopted and acted upon [*i.e.,* an election is held], does not require further judicial supervision").

Accordingly, this court did not transfer King's complaint to the *Hastert* court for further proceedings under Rule 60(b).

### 2. Conditional Judicial Notice

■ Although King was not a party to the *Hastert* litigation and thus could not be bound by that court's findings of fact or judgment under the doctrines of *collateral estoppel* or *res judicata,*[11] his complaint both directly and indirectly challenged the *Hastert* court's findings of fact and judgment. In recognition of the unique nature of King's claim and to expedite the proceedings at trial, this court took judicial notice of the *Hastert* court's findings of fact under Federal Rule of Evidence 201. *See, e.g., Philips Medical Sys. Int'l, B.V. v. Bruetman,* 982 F.2d 211, 215 n. 2 (7th Cir.1992) (federal courts may take judicial notice of proceedings, including evidence, in other courts both within and outside of the federal judicial system "if the proceedings have a direct relation to matters at issue"); *Green v. Warden,*

**10.** In this regard, the *Hastert* court essentially foresaw that a revised reapportionment plan could supplant and supersede its order either through legislative action or a subsequent court challenge, provided the revised plan was "in accordance with [the] law." Thus, a subsequent court challenge to the *Hastert* court's order would not threaten the interests of comity or the orderly administration of justice where the challenge was based upon a change in law.

**11.** The doctrine of collateral estoppel provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *accord Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.,* 58 F.3d 303, 307 (7th Cir.1995). Collateral estoppel precludes relitigation of issues in a subsequent proceeding when:

(1) the party against whom the doctrine is asserted was a party to the earlier proceeding; (2) the issue was actually litigated and decided on the merits; (3) the resolution of the particular issue was necessary to the result; and (4) the issues are identical. *Havoco,* 58 F.3d at 307; *Kraushaar v. Flanigan,* 45 F.3d 1040, 1050 (7th Cir.1995).

In contrast, under *res judicata,* "a judgment on the merits in a prior suit bars a second suit involving the same parties, or their proxies, based on the same cause of action." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *accord Brzostowski v. Laidlaw Waste Systems, Inc.,* 49 F.3d 337, 338 (7th Cir.1995). Three elements must exist for *res judicata* to apply: (1) a judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action between both suits. *Brzostowski,* 49 F.3d at 338.

*U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir.), *cert. denied* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983) (same). More specifically, this court informed the parties that it would admit into evidence the *Hastert* court's finding of facts and would adopt those findings as conclusive unless King showed by law or otherwise that the *Hastert* court either erred in making specific findings of fact or that the circumstances had changed since November 1991 such that specific findings of fact were no longer valid and needed to be modified. *See* Tr., at 36, 652.

■ This court conditionally admitted the *Hastert* court's findings of fact through judicial notice for two reasons. First, had King

been a party or in privity with a party to the *Hastert* action, his constitutional challenge of the *Hastert* court's order and findings of fact would have proceeded under Rule 60(b).[12] Under Rule 60(b), the *Hastert* court's findings of fact made pursuant to Rule 52(a) would have been law of the case. *See Bennett v. Arrington*, 806 F.Supp. 926, 927 n. 2 (N.D.Ala.1992), *aff'd in part, rev'd in part on other grounds* 20 F.3d 1525 (11th Cir.1994).[13] As such, the *Hastert* court would not have reexamined its factual findings to decide a Rule 60(b) motion unless powerful reasons existed for doing so—such as the occurrence of manifest error or a controlling or significant change in the factual circumstances.[14]

---

**12.** Assuming standing, King at a minimum could have moved for a modification of the *Hastert* court's order under Rule 60(b)(6). A motion for relief under Rule 60(b)(6) is only appropriate if the grounds for relief do not fit under any of the other subsections of Rule 60(b). *Margoles v. Johns*, 798 F.2d 1069, 1073 n. 6 (7th Cir.1986) (citation omitted), *cert. denied* 482 U.S. 905, 107 S.Ct. 2482, 96 L.Ed.2d 374 (1987). Relief under Rule 60(b)(6) is only warranted "upon a showing of extraordinary circumstances that create a substantial danger that the underlying judgment was unjust." *Id.* at 1073 (*citing Ackermann v. United States*, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950)). While a post-judgment change in decisional law, without more, is insufficient to constitute an extraordinary circumstance permitting relief under Rule 60(b), *see McKnight v. United States Steel Corp.*, 726 F.2d 333, 336 (7th Cir. 1984), extraordinary circumstances will be found to exist where, as here, the change in decisional law may render the court's prior decision unconstitutional. *See, e.g., McGeshick v. Choucair*, 72 F.3d 62, 63 (7th Cir.1995) ("A supervening change in governing law that calls into serious question the correctness of the court's judgment may justify recall of a mandate.").

In addition, a motion for relief from judgment under Rule 60(b)(5) or (b)(6) must be made "within a reasonable time." *See* Fed.R.Civ.P. 60(b). Because King based his constitutional challenge in part on a change in the governing law, any inquiry into the timeliness of King's challenge must necessarily focus on the passage of time between the advent of the changed law (*i.e.*, the issuance of the Supreme Court's *Shaw v. Reno* decision in June 1993) and the filing of King's complaint. This twenty month time period (*i.e.*, June 1993 to February 1995) is not too excessive to be declared unreasonable. *See Pac for Middle Am. v. State Bd. of Elections*, No. 95 C 827, 1995 WL 571887, *4 (N.D.Ill. Sept.20, 1995) (three judge panel).

**13.** The *Bennett* litigation originated in 1981 as a reverse discrimination claim arising out a con-

sent decree. *See Bennett*, 806 F.Supp. at 927. Following a trial in 1985, the court led against the plaintiffs on their reverse discrimination claim. *See In re Birmingham Reverse Discrimination Employment Litigation*, No. 84–P–0903–S, 1985 WL 56690 (N.D.Ala.1985). The Eleventh Circuit reversed, *see In re Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir.1987), *aff'd Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). The Supreme Court remanded the case to the district court for further trial on the plaintiffs' reverse discrimination claim. On remand, the district court adopted the findings of fact of the 1985 trial court under the law of the case doctrine, explaining:

> Numerous findings of fact were made by the district court [in 1985].... There is no need to repeat these findings, which were not set aside on appeal and under the law of the case remain as determinations for purposes of this decision.

*Bennett*, 806 F.Supp. at 927 n. 2 (citation omitted). Like the *Bennett* court, this court will adopt the *Hastert* court's factual determinations for the purposes of this decision, excluding any clearly erroneous findings and any findings that are no longer valid due to changed circumstances.

**14.** As previously noted, the law of the case doctrine essentially functions as a motion for reconsideration in this context. *See Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991). The grounds for entertaining a motion for reconsideration—to correct manifest errors of law or fact or to consider controlling or significant changes in the law or facts since the matter was submitted to the court—thus define the grounds for entertaining a subsequent challenge under Rule 60(b) to a court's specific findings of fact. *See United States v. Gramley*, 893 F.Supp. 768, 773 (N.D.Ill.1995) (Rule 60(b) permits a court to correct "manifest errors of law or fact"); *Jones v.*

Since King's lawsuit is at its very core a challenge to the *Hastert* court's order, this court concluded that King's lack of standing under Rule 60(b) should not determine the standard of review applicable to the *Hastert* court's findings of fact. The court therefore adopted the standards that would have applied had King sought to modify the *Hastert* order under Rule 60(b).[15] The court also conditionally admitted the *Hastert* court's findings of fact to promote important interests in finality and judicial economy.[16]

To demonstrate that the *Hastert* court erred in making a specific finding of fact, King has to establish that the court committed clear error.[17] *See Fed.R.Civ.P. 52(a).* A finding of fact is " 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564,

573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *United States v. Price,* 54 F.3d 342, 348 (7th Cir.1995). Under this standard, the court must strongly defer to the trier of fact's findings. *In re Love,* 957 F.2d 1350, 1354 (7th Cir.1992). As such, "if the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced that it would have weighted the evidence differently as a trier of fact." *Id.* "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. Accordingly, unless clear error is established, this court will defer to the *Hastert* court's findings of fact. *See Johnson v. Mortham,* 915 F.Supp. 1529 (N.D.Fla. 1995).[18]

*Banks,* 892 F.Supp. 988, 989 (N.D.Ill.1995) (same); *see also Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990) (recognizing grounds for reconsideration due to changes in controlling law or facts).

**15.** This court has slightly modified the standards to comport to the procedural posture of this case (*i.e.,* King has filed an independent lawsuit rather than a Rule 60(b) motion to vacate of modify the *Hastert* judgment). Accordingly, this court will consider the *Hastert* court's findings of fact conclusive unless King establishes that the *Hastert* court committed clear error in making specific findings of fact or proves by a preponderance of the evidence that the factual circumstances have changed since the issuance of the *Hastert* decision.

**16.** The concepts of finality and judicial economy provide a very pragmatic foundation for the standard of review adopted by this court. Since King has brought this lawsuit in his individual capacity rather than on behalf of a certified class, this court's findings of fact would not bind other potential private litigants who are not in privity with King. It is therefore conceivable that these other potential litigants, displeased by this court's ruling, might separately file a series of lawsuits challenging the constitutionality of the Fourth Congressional District. If the court failed to take judicial notice of and conditionally admit the *Hastert* court's factual findings, its ability to render a final judgment on the district's constitutionality would prove elusive. Each successive challenge would require the development of new, potentially inconsistent factual records. By taking judicial notice of and conditionally admitting

its prior fact findings, the court has established a common core of facts that may only be modified by proof of changed circumstances or demonstration of clear error. If the party challenging the district's constitutionality fails to allege or establish the existence of changed factual circumstances or clear error of significant magnitude to affect the constitutional analysis, a court should be able to dispose of the lawsuit under Rules 12, 56 or 50(a). In this manner, this court's decision to take judicial notice of the *Hastert* court's findings of fact furthers the interests of finality and judicial economy while avoiding the potential hazards associated with successive, cumulative constitutional challenges brought by independent litigants.

**17.** Rule 52, entitled "Findings by the Court; Judgment on Partial Findings" provides in pertinent part:

(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusion of law thereon, . . . . Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

**18.** A brief review of the on-going *Johnson* litigation is required. After the Florida legislature failed to adopt a congressional reapportionment plan to comply with the 1990 census results, the task fell to the federal court. The district court initially held the existing plan unconstitutional, and appointed a Master to recommend a replace-

Alternatively, King must establish by a preponderance of evidence that specific factual circumstances have changed. *See Jackson v. DeSoto Parish Sch. Bd.,* 585 F.2d 726, 730 (5th Cir.1978). Once such evidence has been proffered, this court will analyze the particular finding of fact *de novo.*

In addition to taking judicial notice of the *Hastert* court's findings of fact, this court took judicial notice of the evidence presented to the *Hastert* court. (Tr. at 638). The court admitted this evidence for the limited purpose of establishing the evidentiary record upon which the *Hastert* court relied to make its decision. *(Id.).* The *Hastert* court's evidentiary record was not admitted for any other purpose, except where one of the parties individually or jointly moved for the admission of a particular portion of that record.

B. Standard of Review of the *Hastert* court's Conclusions of Law

■ An appellate court traditionally reviews a district court's conclusions of law *de novo. See Apostol v. Landau,* 957 F.2d 339, 341 (7th Cir.1992). Under this standard, the appellate court is not bound by the district court's legal conclusions but instead examines the law "anew." *Lulich v. Sherwin–Williams Co.,* 992 F.2d 719, 721 (7th Cir. 1993); *Black's Law Dict.* 392 (5th ed.1979). Although this court is not an appellate court, the nature of King's complaint requires it to review the *Hastert* court's legal conclusions. Under these circumstances, this court adopted the law of the case doctrine as the standard of review for the *Hastert* court's legal conclusions. As with a motion to vacate or modify a judgment under Rule 60(b), this court will not disturb the *Hastert* court's conclusions of law but for manifest or plain

error. *See Russell v. Delco Remy Div. of Gen. Motors,* 51 F.3d 746, 749 (7th Cir.1995) (discussed *supra* in footnote 8). At the same time, however, this court will review *de novo* the *Hastert* court's conclusions of law where the decisional law has arguably changed.

King proffers three "powerful reasons" warranting reexamination of the *Hastert* court's findings of fact and conclusions of law: first, the governing law has changed as a result of the Supreme Court's decisions in *Shaw* and *Miller;* second, certain factual findings made by the *Hastert* court were clearly erroneous; and third, the facts have changed since November 1991.

II. The *Hastert* Court's Decision

The 1990 decennial census report revealed that Illinois' population had grown by 4,084 people, or 0.0357%, between 1980 and 1990. *Hastert,* 777 F.Supp. at 637. Because the rate of Illinois' population growth was proportionally smaller than that of the United States as a whole, Illinois was only entitled to twenty seats in the United States House of Representatives rather than its previous twenty-two. The Illinois constitution required the General Assembly to reapportion the state's congressional districts to comport with the 1990 census results; however, it failed to do so. As a result of the General Assembly's abdication of its constitutional responsibility, five separate lawsuits were filed seeking a common declaration; namely, Illinois' then existing congressional districting plan was unconstitutional due to the population and demographic changes represented in the 1990 census report. *Id.*

The Republican Party members of the 1990 Illinois congressional delegation (the *"Hastert"* plaintiffs) filed the first lawsuit on June 27, 1991. Shortly thereafter, a group of

---

ment plan. *See DeGrandy v. Wetherell,* 794 F.Supp. 1076 (N.D.Fla.1992). The *DeGrandy* court subsequently adopted the Master's Report and Recommendation, which created two African–American majority-minority districts and one African–American influence district. Following the Supreme Court's decision in *Shaw,* plaintiffs filed a lawsuit in 1994 alleging that District 3 (one of the majority-minority districts created in the 1992 court order) violated the Equal Protection Clause. The court found that District 3 was oddly configured. *See Johnson,*

915 F.Supp. at 1533–34. The plaintiff subsequently moved for summary judgment. The *Johnson* court granted the motion in part, concluding as a matter of law, that the plaintiffs proved that racial considerations predominated in the drawing of District 3. The *Johnson* court relied upon specific findings made by the *DeGrandy* court as the basis for its ruling. *Id.* at 1150–51. The *Johnson* court denied, however, plaintiffs' motion for summary judgment with respect to whether District 3 survives strict scrutiny.

Hispanic and African–American resident-voters (the *"Nieves"* plaintiffs) filed the second lawsuit seeking, *inter alia,* the creation of a majority-minority Hispanic congressional district under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Next, a group of resident voters from various Illinois congressional districts, ostensibly acting on behalf of the Democratic Party members of the 1990 Illinois congressional delegation (the *"Rosebrook"* plaintiffs), filed the third lawsuit. Representative Cardiss Collins (D–IL; 7th Dist.) and Representative Charles Hayes (D–IL; 1st Dist.) jointly filed the fourth lawsuit (the *"Collins"* plaintiffs). Finally, the Chicago Urban League filed the fifth lawsuit on behalf of the resident voters in the then existing majority-minority African–American congressional districts. Each group of plaintiffs submitted a proposed redistricting plan to the court for consideration.[19] All five lawsuits were consolidated into a single proceeding for trial.

The *Hastert* court conducted a two day trial beginning on October 7, 1991. Due to time constraints imposed by the 1992 election filing deadlines, the court streamlined the proceedings "in a manner that would still enable the parties to present a complete record on the serious constitutional matters at issue."[20] *Hastert,* 777 F.Supp. at 639. To that end, the court "directed the parties to submit their evidence in the form of affidavits and depositions, supplemented by any maps and statistical data...." *Id.* at 639–40. The court limited the parties to a single proposed plan and map at trial, and entertained argument mainly through post-trial briefs. *Id.* at 640.

As a result of these streamlined proceedings, the parties resolved numerous issues through negotiation, concession, and stipulation. In so doing, the parties not only effectively supplanted the *Hastert* court's fact finding role in many instances but also narrowed the number of substantive legal issues the court needed to decide. The court explained:

> The parties worked diligently during discovery and the two-day trial to resolve numerous areas of significant disagreement in their competing plans. The pre-trial proceedings were marked by a succession of amendments to the principal redistricting proposals, with each of the new amended plans incrementally eliminating a complex area of potential conflict.

*Id.* at 640. The magnitude of complex issues resolved by stipulation among the parties was unprecedented.[21] According to the *Hastert* court, not only did all of the parties agree throughout the proceedings that "the population and demographic changes within the City of Chicago from 1980 to 1990 mandated the creation of an Hispanic majority district," but they also reached an agreement prior to trial as to "the configuration of the proposed Hispanic majority district." *Id.* These pre-trial agreements between the parties had significant consequences on the conduct and outcome of the trial.

> By reaching an agreement on the configuration of a proposed Hispanic district, the parties greatly simplified a perplexing issue. Indeed, *an agreement on this issue may be the crucial factor in facilitating the creation of an Hispanic district.* The

---

19. The *Hastert* court also permitted several individuals and organizations to intervene. Of these plaintiffs-intervenors, only then Representative Augustus Savage (D–IL; 2d Dist.) and the Harold Washington Party, acting in tandem, submitted a proposed redistricting map to the court. *Hastert,* 777 F.Supp. at 639. Thus, at the onset of the case, six different redistricting plans had been submitted to the court.

20. The court's goal was to issue its judgment "in a timely fashion to allow any of the participants adequate time for appeal to the Supreme Court prior to the December 16, 1991 filing deadline for the March 17, 1992 congressional primary elections." *Hastert,* 777 F.Supp. at 639.

21. The pre-trial negotiations and agreements between the diverse parties were highly reminiscent of the compromising which characterizes the legislative process. In fact, if the parties were aligned on partisan political grounds, the alignment would resemble the composition of the state legislature (*i.e.,* the *Hastert* Republicans versus the *Rosebrook et al.* Democrats). Because of this partisan alignment, agreements reached by the parties had an important value beyond merely advancing the litigation's timetable. More specifically, the partisan alignment supported the reasonable inference that the bi-partisan agreements and stipulations reflected the beliefs of the General Assembly.

agreement on the proposed Hispanic district removed the Hispanic contingent among the *Nieves* plaintiffs as active participants at trial.[22]

*Id.* (emphasis added).

The *Hastert* court summarized the effect of the streamlined proceedings as follows:

> As a consequence of the admirable efforts of counsel to come to an agreement on many issues, the trial focused primarily on the redistricting proposals of the *Hastert* and *Rosebrook* plaintiffs. We are left primarily with the task of determining which of the two proposed plans best meets the goals and criteria, both constitutional and non-constitutional, enumerated by the Supreme Court.

*Id.* In short, the parties' pre-trial negotiations and agreements significantly narrowed the court's role. Essentially two tasks (relevant to this lawsuit) remained for the *Hastert* court: first, to analyze the revised *Hastert* and *Rosebrook* redistricting plans to determine which plan better satisfied constitutional standards;[23] and second, to determine whether Section 2 of the Voting Rights Act required the creation of an Hispanic majority-minority district.

### A. The Court's Constitutional Analysis

The proposed *Hastert* and *Rosebrook* redistricting plans were substantially similar in purpose, design and configuration but differed in the final allocation of the electorate within the twenty congressional districts.[24] The *Hastert* court therefore set forth to determine which proposed plan better satisfied the governing constitutional requirements of population equality, fairness to minority voting rights (*i.e.*, vote dilution), and political fairness.

The court first assessed the two proposed plans under the one person, one vote theory of representation articulated in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The court ultimately concluded that the proposed *Hastert* plan, with a total deviation of 0.00017% from the ideal congressional district population of 571,530, better advanced the one person, one vote principle than the proposed *Rosebrook* plan, which had a total deviation of 0.00297%. *Hastert*, 777 F.Supp. at 644.

The court next evaluated the proposed plans for their fairness to the voting rights of racial and language minorities. *Hastert*, 777 F.Supp. at 645. This inquiry required the court to assess whether either of the proposed redistricting plans had the discriminatory effect of diluting the power of minority votes.[25] The court found that neither proposal diluted minority voting power and ultimately concluded that the proposed *Hastert* plan better satisfied this constitutional criterion.[26]

---

**22.** In addition to the parties' agreement about the creation and configuration of an Hispanic majority-minority district, the parties also resolved via stipulation the configuration of the Second Congressional District (a super-majority African–American Congressional District) and the location of certain downstate minority communities. *Id.*

**23.** It was a foregone conclusion that the 1980 redistricting plan was unconstitutional.

> All parties are in agreement that the existing congressional district plan is both unconstitutional and impracticable. Consequently, we proceed directly to an evaluation of the constitutional and legal merits of the proposed *Hastert* and *Rosebrook* plans.

*Hastert*, 777 F.Supp. at 641. The court analyzed the *Hastert* third amended redistricting plan and the *Rosebrook* first amended redistricting plan. *Id.* at 641 n. 8.

**24.** According to the court, "protection of the interests of minority communities was a driving force for both the *Hastert* and *Rosebrook* plain-

tiffs." *Hastert*, 777 F.Supp. at 646 n. 19. As a result of the bipartisan pre-trial negotiations, no minority group objected to the proposed revised *Hastert* or *Rosebrook* redistricting plans. *Id.*

**25.** Vote dilution occurs either by fragmenting large concentrations of minority populations and dispersing them into separate political districts, or by concentrating minorities into districts where they constitute an excessive majority. *Hastert*, 777 F.Supp. at 646 (*citing Thornburg v. Gingles*, 478 U.S. 30, 46 n. 11, 106 S.Ct. 2752, 2764 n. 1, 92 L.Ed.2d 25 (1986)).

**26.** 1981 court order which reapportioned Illinois' congressional districts in accordance 1980 decennial census results created three "super-majority" African–American congressional districts; namely, the First, Second and Seventh Congressional districts. *See Hastert*, 777 F.Supp. at 646–47 (*citing In re Congressional Dists.* Cases, No 81 C 3915, slip op. (N.D.Ill. Nov. 23, 1981)). These districts contained the sixty-five percent (65%) minority population and sixty percent

Finally, the court assessed the proposed plans for political fairness, meaning whether one or both of the proposed plans had the effect of discriminating against an identifiable political group. *Hastert*, 777 F.Supp. at 655, 656. Both plans sought to address the then existing discrepancy between Democratic and Republican congressional representation.[27] The *Rosebrook* plaintiffs argued, however, that the *Hastert* plan would result in a politically unfair redistribution of congressional seats. *Id.* at 656, 658. After an extensive analysis, the court rejected this contention, concluding that "[t]he data suggests that the *Hastert* plan is likely to yield a distribution of seats across party lines that mirrors the statewide partisan makeup of the voting citizenry...." *Id.* at 659. It further concluded that the *Hastert* plan was politically more fair. *Id.*

B. The Court's Section 2 Voting Rights Act Analysis

■ As previously established, all of the parties initially agreed that Section 2 of the Voting Rights Act "mandated" the creation of an Hispanic majority district and further agreed to the general configuration of such a district. As a result, the proposed configurations of the Hispanic district in the *Hastert* and *Rosebrook* plans were virtually identical: the district would link the two densely populated Hispanic communities on Chicago's

near northwest and near southwest sides though a narrowly drawn, C–shaped connector that wound around the western edge of the Seventh Congressional District.[28] The *Hastert* court concluded that the proposed Hispanic district had an "extraordinary appearance" that was "not unlike a Rorschach blot turned on its side."[29] *Hastert*, 777 F.Supp. at 648 n. 24. Even though all of the parties agreed to this extraordinary configuration, the court declined to "accept this conclusion without scrutiny." *Id.* at 648. It therefore undertook to determine whether Section 2 of the Voting Rights Act required the creation of an Hispanic majority district.

A minority group seeking the creation of a majority-minority district under Section 2 must "make a threshold showing that it is: (1) sufficiently large and geographically compact to constitute a majority in a properly drawn district; (2) politically cohesive; and (3) that racial bloc voting typically frustrates the election of the minority group's preferred candidate." *Hastert*, 777 F.Supp. at 649 (*citing Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766). The court determined that the Chicago/Cook County Hispanic community satisfied each of these threshold requirements.

The court made the following findings of fact to support its conclusion that the Chicago/Cook County Hispanic community was "sufficiently large and geographically com-

---

(60%) voting age population generally regarded as the necessary threshold for creating a "safe" minority district. *Id.* at 647–48 & n. 22.

The proposed *Hastert* and *Rosebrook* plans each retained these three majority African–American congressional districts, despite the "major demographic changes during the 1980's" that necessitated "radical alterations in the configuration of the existing minority districts." *Hastert*, 777 F.Supp. at 646 n. 19. The three supermajority African–American districts were retained as a result of bipartisan agreement. *See id.*

The *Hastert* court ultimately concluded that the proposed *Hastert* plan better addressed fairness concerns for minority voting power because its allocation of the African–American population within the three super-majority congressional districts more closely comported with the 65%–60% threshold than the *Rosebrook* plan's allocation. *Hastert*, 777 F.Supp. at 648, 655. The court likewise concluded that the *Hastert* plan, which created an Hispanic majority district with a 65.03% total and 59.18% voting age Hispanic

population, was "marginally superior" to the *Rosebrook* plan, which contain an Hispanic majority district with corresponding concentrations of 65.00% and 59.15%. *Id.* at 651, 655.

27. After the 1990 election, the Democrat members of the Illinois congressional delegation outnumbered their Republican counterparts fifteen (15) to seven (7).

28. The two Hispanic enclaves were separated by the Seventh Congressional District, which runs in a roughly east-west direction along Chicago's central latitudes from Lake Michigan to the western suburbs. *Hastert*, 777 F.Supp. at 648 n. 24.

29. It further observed that the proposed configuration of the Hispanic Fourth Congressional District made the "bizarre" configuration of New Jersey's 1982 congressional reapportionment plan in *Karcher v. Daggett*, 462 U.S. 725, 744–65, 103 S.Ct. 2653, 2667–78, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring), appear "acceptable by comparison." *Id.*

pact to constitute a single district majority." *Hastert,* 777 F.Supp. at 649. First, the 1990 census reported the Hispanic population in Chicago at 545,852, a 29.33% increase over the 1980 total. *Id.* Second, "[m]ost of the Chicago/Cook County Hispanic population is clustered in two dense enclaves, one on Chicago's near northwest side and one on the near southwest side." *Id.* Third, the two enclaves are less than one mile apart at their closest point. *Id.* Fourth, this separation resulted from exogenous physical and institutional barriers—specifically, the east-west Eisenhower Expressway, the University of Illinois–Chicago Circle campus, and various major medical institutions—and thus did not indicate the existence of two distinct communities. *Id.* & n. 25.

To support its conclusion that the Chicago/Cook County Hispanic community was politically cohesive, the court adopted the findings of cohesiveness made by two federal courts in the early 1980s in cases where the Hispanic community challenged discriminatory redistricting practices at the state and local levels. *Hastert,* 777 F.Supp. at 650 (citing *Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984), *cert. denied* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985) (Chicago aldermanic redistricting plan); *Rybicki v. State Bd. of Elections,* 574 F.Supp. 1082 (N.D.Ill.1982) (three judge panel) (state legislative redistricting plan), *supplemented* 574 F.Supp. 1147 (N.D.Ill.), *supplemented* 574 F.Supp. 1161 (N.D.Ill.1983)). The court further found that the voting bloc patterns of the Hispanic community also demonstrated its political cohesiveness. *Id.* More specifically, the court found that "[s]ingle and bivariate regression analysis of voting patterns in Chicago precincts demonstrate significant ethnic bloc voting patterns." *Id.* Finally, the court found that the third threshold factor was fulfilled because the paucity of Hispanic officials in city and state-wide elected political offices compelled "the finding that ethnic bloc voting patterns have thwarted the political interests of the Hispanic community." *Id.*

Having found the three threshold requirements satisfied, the court then considered the merits of the claimed need for an Hispanic majority-minority district under "the totality of the circumstances test." *Hastert,* 777 F.Supp. at 649. The relevant factors generally considered under the totality of the circumstances test include

> a history of official discrimination relating to minority political participation; the extent of racially polarized voting practices; the extent to which certain voting practices and procedures with discriminatory effects have been employed in the past; the exclusion of the minority group from the candidate slating process; the extent to which the minority group bears the effects of past discrimination in education, employment and health services which hinder their ability to effectively participate in the political process; the use of racial appeals in political campaigns; the extent to which minorities have been elected to office; and the lack of responsiveness by elected officials to particular minority needs.

*Id.* (citations omitted). However, rather than making its own findings of fact with respect to these factors, the court adopted the Seventh Circuit's findings concerning the Chicago Hispanic community set forth in *Ketchum v. Byrne,* the Section 2 Voting Rights Act challenge of the 1982 Chicago aldermanic redistricting plan. *Id.* Based on a "judicially recognized history of discrimination, both past and present, against the Chicago Hispanic community and its attendant impact on effective political participation and representation," the *Hastert* court concluded that an Hispanic majority district was warranted under *Gingles.* *Id.* The court further concluded that the "odd configuration" of the majority-minority Hispanic Fourth Congressional District was necessary to accommodate the creation of the Hispanic and the three African–American majority-minority districts "dictated under the Voting Rights Act." *Id.* The court therefore concluded that "the configuration has been drafted to *satisfy* constitutional and statutory goals and principles." *Id.* (emphasis in original).

### III. King's Constitutional Challenge of the *Hastert* Court's Decision

As previously established, King contends that the boundaries of the majority Hispanic Fourth Congressional District were drawn on

the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment. The idea that a legislative redistricting plan that segregated the electorate on the basis of race might violate the Equal Protection Clause first surfaced in the 1960s. *See Gomillion v. Lightfoot,* 364 U.S. 339, 349, 81 S.Ct. 125, 131, 5 L.Ed.2d 110 (1960) (Whittaker, J., concurring) (plan to redefine city's borders to place Negro voters outside of city limits was an unlawful segregation of citizens on basis of race in violation of the Equal Protection Clause); *Wright v. Rockefeller,* 376 U.S. 52, 56, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964) (congressional redistricting plan that allegedly segregated eligible voters by race and place of origin was challenged as a violation of the Equal Protection Clause). The Supreme Court, however, did not formally recognize an Equal Protection Clause challenge to redistricting plans until its 1993 decision in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), where it recognized a claim challenging the constitutionality of a bizarrely drawn but facially race-neutral redistricting plan. Two years later in *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), the Supreme Court further defined the contours of this Equal Protection Clause claim. Since *Shaw* and *Miller* were both decided after *Hastert,* the *Hastert* court did not have occasion to consider whether the extraordinary configuration of the Fourth Congressional District may have violated the Equal Protection Clause. Accordingly, the *Hastert* court's conclusion that the district's extraordinary configuration was necessary to "satisfy constitutional principles" is rendered circumspect by the change in governing law and is therefore subject to *de novo* review.

■■■ The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const., Amdt. 14, § 1.* The clause's "central mandate is race neutrality in governmental decisionmaking." *Miller,* 515 U.S. at 904, 115 S.Ct. at 2482. The prohibitions of the Equal Protection Clause extend not only to laws that explicitly distinguish between individuals on the basis of race but also to laws that appear racially neutral but are "unexplainable on grounds other than race." *Shaw,* 509 U.S. at 643, 113 S.Ct. at 2824, 2825 (*quoting Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977)); *accord Miller,* 515 U.S. at 905–06, 115 S.Ct. at 2483. Although application of the Equal Protection Clause's mandate is often difficult, "the basic principle is straightforward: 'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.' "[30] *Miller,* 515 U.S. at 904, 115 S.Ct. at 2482 (*quoting Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978)). Laws that classify citizens on the basis of race cannot be upheld unless they are narrowly tailored to achieve a compelling state interest. *Id.* (citations omitted); *Shaw,* 509 U.S. at 643–45, 113 S.Ct. at 2825.

■■■ In *Shaw,* the Supreme Court held that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." 509 U.S. at 649, 113 S.Ct. at 2828. The appearance of the reapportioned district is therefore an important factor in ascertain-

---

**30.** The Supreme Court has never held that "race-conscious state decisionmaking" is impermissible in all circumstances. *Shaw,* 509 U.S. at 642, 646, 113 S.Ct. at 2824, 2826. The *Miller* Court further explained:

A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests. '[W]hen members of a racial group live together in a community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes.' *Shaw, supra,* at 646 [113 S.Ct. at 2826]. But where the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with equal protection mandates. *Id.* at 647 [113 S.Ct. at 2827];....

*Miller,* 515 U.S. at 920, 115 S.Ct. at 2490.

ing whether the electorate was impermissibly segregated on the basis of race. *Id.* at 647, 113 S.Ct. at 2827 ("appearances do matter" in redistricting).

 The *Hastert* court readily observed that the majority Hispanic Fourth Congressional District was bizarrely configured and "resembled a Rorschach blot turned on its side." 777 F.Supp. at 648 n. 24. Although the *Hastert* court is presumed to have acted constitutionally in issuing its reapportionment order, *see United States v. Paradise,* 480 U.S. 149, 183, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987);[31] *see also Miller,* 515 U.S. at 915–17, 115 S.Ct. at 2488 (until a claimant makes a showing sufficient to support an allegation of race-based districting, the court must presume that the legislature acted in good faith), the presumption is necessarily limited by the scope of the court's constitutional analysis. Since the *Hastert* court did not analyze whether the oddly drawn Fourth Congressional District met the requirements of the Equal Protection Clause, a presumption of constitutionality does not arise and no deference is accorded to the *Hastert* court on this issue.

There is no dispute that the *Hastert* court considered race and ethnicity in its attempt to further the goals of the Voting Rights Act.[32] *Hastert,* 777 F.Supp. at 650–51. The question is whether in attempting to remedy a Section 2 Voting Rights Act violation, the *Hastert* court adopted a redistricting plan that apportioned the electorate on the basis of race and ethnicity in violation of the Fourteenth Amendment's Equal Protection Clause. Accordingly, the extraordinarily configured Fourth Congressional District must be subjected to an Equal Protection Clause analysis to determine its constitutionality.

**31.** In *Paradise,* the Court stated:

We must acknowledge the respect owned a district judge's judgment that specified relief is essential to cure a violation of the Fourteenth Amendment. A district court has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'

## A. Standards for Equal Protection Clause Analysis of Redistricting Plan

 "The essence of [the] Equal Protection Clause claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts." *Miller,* 515 U.S. at 911, 115 S.Ct. at 2485. When the State uses race in this manner, it has engaged in racial gerrymandering (*i.e.,* "the deliberate and arbitrary distortion of district boundaries ... for racial purposes"). *See Shaw,* 509 U.S. at 640, 113 S.Ct. at 2823 (*citing Davis v. Bandemer,* 478 U.S. 109, 164, 106 S.Ct. 2797, 2826, 92 L.Ed.2d 85 (1986) (Powell, J., concurring in part and dissenting in part)). To determine whether a redistricting plan has been racially gerrymandered, the court must focus on the role that race played in the drawing of the district's borders. The court, however, does not make this assessment in a vacuum.

### 1. Determining the Role of Race in the Redistricting Plan

 The court's analysis begins by recognizing two fundamental principles of redistricting. First, race is one of many demographic factors inherently considered in the redistricting process. As the Supreme Court observed in *Shaw,*

redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors.

509 U.S. at 646, 113 S.Ct. at 2826; *Miller,* 515 U.S. at 913–15, 115 S.Ct. at 2487. Second, legislatures also generally consider "traditional districting principles"—compactness, contiguity, and respect for both political sub-

480 U.S. at 183, 107 S.Ct. at 1073 (*quoting Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)).

**32.** The court specifically acknowledged that "[f]acial and ethnic considerations are appropriate to drawing districts to advance the goals of the Voting Rights Act." *Hastert,* 777 F.Supp. at 650–51 (*citing United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977)).

divisions and communities of shared interests—in deciding how to reapportion district boundaries. The court's task is to isolate the role that race played in redistricting vis-a-vis the traditional race-neutral districting principles and other non-racial demographic factors. The court's undertaking is difficult in and of itself;[33] it is only made harder by the complex interplay of forces that enter a legislature's redistricting calculus. *Miller,* 515 U.S. at 915–16, 115 S.Ct. at 2488. In the end, however, only two conclusions are possible: first, race was the predominate consideration that guided the creation of the district; or second, race was but one of many factors of equal or greater weight that guided the creation of the district.[34]

■ If the court determines that race played the predominate role in drawing the district's boundaries, then the redistricting plan was racially gerrymandered. *See Miller,* 515 U.S. at 915–21, 115 S.Ct. at 2488–90; *Shaw,* 509 U.S. at 641–50, 113 S.Ct. at 2824–28. Race plays the predominate role when the legislature has subordinated all other considerations, including the race-neutral traditional districting principles (*i.e.,* compactness, contiguity, and respect for both political subdivisions and communities of shared interests), to racial considerations in determining the district's configuration. *Id.* On the other hand, if the court determines that race was merely one factor among many other race-neutral factors accorded equal or greater significance by the legislature in drawing the district's boundaries, then race was not the predominate factor and the redistricting plan is not subject to strict scrutiny. *See Miller,* 515 U.S. at 916, 115 S.Ct. at 2488 ("where these [traditional districting principles] or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can 'defeat a claim that a district has been gerrymandered on racial lines'") (*quot-*

*ing Shaw,* 509 U.S. at 647, 113 S.Ct. at 2827); *DeWitt v. Wilson,* 856 F.Supp. 1409, 1415 (E.D.Cal.1994) ("we conclude that in the context or redistricting, where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act, that strict scrutiny is not required"), *aff'd in part and appeal dismissed in part* 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). In this manner, the traditional race-neutral districting principles function as "objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines." *Shaw,* 509 U.S. at 647, 113 S.Ct. at 2827.

■ A district does not need to be bizarrely shaped to warrant constitutional review. *See Miller,* 515 U.S. at 913, 115 S.Ct. at 2486. According to the Supreme Court,

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.[35]

*Id.* Rather, parties may rely on evidence other than bizarreness to establish race-based districting. *Id.* (citations omitted).

■ The party challenging the district's constitutionality has the burden of persuasion to prove "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller,* 515 U.S. at 916, 115 S.Ct. at 2488. The predominance of race in redistricting may be shown "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to the legislative purpose." *Id.* In sum,

---

33. "The distinction between being aware of racial considerations and being motivated by them may be difficult to make." *Miller,* 515 U.S. at 916, 115 S.Ct. at 2488.

34. One could argue that the presence of racially polarized voting represents a prior determination by the electorate that race overrides other issues in the political algebra of the community.

35. The *Miller* Court later reiterated this point:

> In sum, we make clear that parties alleging that a State has assigned voters on the basis of race are neither confined in their proof of evidence regarding the district's geometry and makeup nor required to make a threshold showing of bizarreness.

515 U.S. at 915, 115 S.Ct. at 2488.

a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Id.*

### 2. Strict Scrutiny

 Once a plaintiff has proven that racial considerations predominated, the court must subject the redistricting plan to strict scrutiny—the "most rigorous and exacting standard of constitutional review." *Miller,* 515 U.S. at 920, 115 S.Ct. at 2490. There are two prongs to this examination: first, the racial classification must be justified by a compelling governmental interest; and second, the means chosen by the State must be narrowly tailored to achieve that goal. *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted). Thus, to satisfy strict scrutiny, "the State

must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller,* 515 U.S. at 920, 115 S.Ct. at 2490 (*citing Shaw,* 509 U.S. at 650–58, 113 S.Ct. at 2829–32; *City of Richmond v. J.A. Croson & Co.,* 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion); *Wygant,* 476 U.S. at 274, 280 & n. 6, 106 S.Ct. at 1847, 1850 & n. 6 (plurality opinion); *cf. Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 229–31, 115 S.Ct. 2097, 2114, 132 L.Ed.2d 158 (1995)). Accordingly, once strict scrutiny is required, the burden shifts to the State defendants to prove that the racially drawn district is justified. *See Miller,* 515 U.S. at 919–21, 115 S.Ct. at 2490 (*citing Shaw,* 509 U.S. at 650–58, 113 S.Ct. at 2829–32); *Vera v. Richards,* 861 F.Supp. 1304, 1336 (S.D.Tex.1994), *cert. granted* 515 U.S. 1172, 115 S.Ct. 2639, 132 L.Ed.2d 877 (1995); *but see Shaw v. Hunt,* 861 F.Supp. 408, 435–36 (E.D.N.C.1994), *cert. granted* 515 U.S. 1172, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995).[36]

36. In *Shaw v. Hunt,* the district court on remand (from *Shaw v. Reno*) recognized a distinction between the burdens of production and of proof in a strict scrutiny analysis. The court reasoned that once a plaintiff proved that race was the predominate consideration and thereby triggered a strict scrutiny analysis, the burden of *production* shifted to the State to demonstrate that its use of race was justified by a compelling governmental interest. *See Shaw,* 861 F.Supp. at 435–36. However, the court concluded that the plaintiff at all times retained the ultimate burden of *persuasion* to establish the constitutional violation; as such, the plaintiff had the burden to prove that the State's use of race was not narrowly tailored to accomplish the asserted compelling interest. *Id.* This ruling has been appealed to the Supreme Court.

Although not explicitly stated, the defendant-intervenors agree with the district court's conclusion in *Shaw* on remand. (*See* DOJ Post–Trial Mem., at 3). The defendant-intervenors, like the *Shaw* court on remand, rely on Justice O'Connor's concurrence in *Wygant* to support their position. In *Wygant,* a plurality of Justices held that racially based lay-off preferences contained in a collective bargaining agreement violated the Equal Protection Clause. In her concurrence, Justice O'Connor wrote in pertinent part:

[I]t is incumbent upon the [plaintiffs] to prove their case; they continue to bear the ultimate burden of persuading the court that the [defendants] evidence did not support an inference of prior discrimination and· thus a remedial purpose, or that the plan was not sufficiently 'nar-

rowly tailored.' Only by meeting this burden [can] the plaintiffs establish a violation of their constitutional rights.

476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring). The other Justices forming the Court's plurality, Chief Justice Burger and Justices Powell and Rehnquist, did not adopt this burden-shifting regimen but instead concluded only that [t]he ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative action program. *Id.* at 277–78, 106 S.Ct. at 1849.

This court declines to follow the burden-shifting approach (reminiscent of Title VII cases) advocated by Justice O'Connor in *Wygant* and adopted by the *Shaw* court on remand. First, the *Shaw* court on remand allocated the burden of proof without the benefit of the Supreme Court's decision in *Miller.* As previously noted, the *Miller* Court concluded that the "State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." The *Miller* Court thus imposed upon the State the dual burdens of demonstrating that a compelling state interest existed *and* that the challenged redistricting plan was "narrowly tailored" to accomplish that interest. This court will follow *Miller,* the controlling law at this time. *See also Bernal v. Fainter,* 467 U.S. 216, 227, 104 S.Ct. 2312, 2319, 81 L.Ed.2d 175 (1984) ("[t]o satisfy strict scrutiny, the State must show that [the challenged statute] furthers a compelling state interest by the least restrictive means practically available"); *In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973) ("In

### 3. Subjecting a Court's Redistricting Order to Strict Scrutiny

■ The above standards notwithstanding, the defendant-intervenors argue that a court-ordered redistricting plan should not be subjected to strict scrutiny where, as in *Hastert*, the plan is imposed to remedy a constitutional or statutory violation. The defendant-intervenors contend in this regard that the Supreme Court's decisions in *Shaw* and *Miller* do not apply to this case because those decisions involved constitutional challenges to *legislatively* created congressional redistricting plans rather than a *court*-ordered redistricting plan. This distinction is without merit for three reasons.

First, the Supreme Court has historically recognized that in some respects, court-ordered remedial redistricting plans must be subject to stricter review than plans drawn by state legislatures. *See Upham v. Seamon*, 456 U.S. 37, 42, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982) (per curiam); *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); *Connor v. Finch*, 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977). These courts have employed a more stringent standard to review court-ordered redistricting plans because reapportionment is a uniquely legislative task for which the court is not ideally suited. *See Connor*, 431 U.S. at 414–15, 97 S.Ct. at 1833–34. There, the Supreme Court explained:

Legislative reapportionment is primarily a matter for legislative consideration and determination, . . . for a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. Where a legislature has failed to reconcile these conflicting state and federal goals, a federal court is left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task. In such circumstances, the court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly and in a manner *'free from any taint of arbitrariness or discrimination.'*

*Id.* at 415, 97 S.Ct. at 1834 (citation omitted) (emphasis added); *accord Wise*, 437 U.S. at 540, 98 S.Ct. at 2497.[37] However, the stricter standard for court-ordered reapportionment plans applies "only to remedies required by the nature and scope of the violation. 'The remedial powers of an equity court must be adequate to the task, but they are not unlimited.'" *Upham*, 456 U.S. at 42, 102 S.Ct. at 1522 (*quoting Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971)). Thus, the legislative versus judicial distinction advocated by the defendant-intervenors is of no consequence where, as in *Hastert*, a court adopted a redistricting plan to remedy a constitutional or statutory viola-

order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest."). Second, Justice O'Connor, writing for the Court in *Adarand*, acknowledged "[t]he Court's failure to produce a majority opinion in *Bakke, Fullilove* and *Wygant* left unresolved the proper analysis for remedial race-based government action." *Adarand*, 515 U.S. at 221, 115 S.Ct. at 2109. Finally, as a matter of policy, the State should bear the burden of proof once strict scrutiny is required since it is the State, and not the private litigant, that is promoting racially based action with all of its attendant harms. *See, e.g., Miller*, 515 U.S. at 911–13, 115 S.Ct. at 2486 (outlining potential harms of racially gerrymandered redistricting plans); *Shaw*, 509 U.S. at 647–50, 113 S.Ct. at 2827–28 (same); *Wygant*, 476 U.S. at 273, 106

S.Ct. at 1846 ("This court has 'consistently repudiated distinctions between citizens solely because of their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'") (*quoting Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967)).

**37.** "Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the 'unwelcome obligation' of the federal court to devise and impose a reapportionment plan pending later legislative action. In discharging this duty, the district courts 'will be held to stricter standards than will a state legislature.'" *Wise*, 437 U.S. at 540, 98 S.Ct. at 2497 (*quoting Connor*, 431 U.S. at 424, 97 S.Ct. at 1833).

tion. Such a court-ordered plan must be strictly scrutinized to ensure that the remedy itself is appropriate and constitutional.[38]

Second, where a State legislature has abdicated its redistricting duty to the court system, the courts are forced to act in a pseudo-legislative capacity. If a lesser standard is applied to court-ordered redistricting plans under these circumstances, the checks and balances inherent in our constitutional framework will be gravely injured in this discrete area. Subjecting a court-ordered plan to strict scrutiny is thus necessary to restore constitutional equipoise. In addition, applying the same standards to both court-ordered and legislatively created redistricting plans is further warranted by the disturbing and growing trend of gross dereliction of duty by State legislatures that are all too ready to leave the political thicket of redistricting to the federal courts.[39] Applying a lesser standard to a court-ordered redistricting plan would only reward such cowardice and encourage more state legislatures to forsake their duties and seek political refuge behind the court's robes. Protecting the integrity of the court requires application of an equal standard of review where, as here, the court is forced by legislative nonfeasance to perform what is a uniquely legislative task.

Third, the Supreme Court in *Adarand* most recently held that all racial classifications imposed by any governmental actor—whether federal, state or local—must be analyzed by a reviewing court under strict scrutiny. 515 U.S. at 235–37, 115 S.Ct. at 2117. Justice O'Connor, writing for the Court, observed that the Court's prior decisions through *Croson* had established three general propositions with respect to governmental racial classifications:

First, skepticism: '[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination.' Second, consistency: 'the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification ... i.e., all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized. And third, congruence: '[e]qual protection analysis in the Fifth Amendment is the same as that under the Fourteenth Amendment.' '

*Adarand*, 515 U.S. at 223–24, 115 S.Ct. at 2111 (citations omitted). Justice O'Connor concluded:

Taken together, these three propositions lead to the conclusion that any person, of whatever race, has the right to demand that *any governmental actor* subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.

*Id.* (emphasis added). Although *Adarand* did not involve a challenge to a court-ordered racial classification, the scope of the Court's conclusion must be extended to include the judicial branch. See, *e.g.*, *Shaw*, 509 U.S. at 657, 113 S.Ct. at 2832 ("Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; . . . . It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny."). Accordingly, strict scrutiny may

---

**38.** Democratic National Committee argues in its *amicus* brief that the Supreme Court as historically distinguished between court-ordered and legislative plans, citing two examples: first, unlike redistricting plans drawn by state or local governments subject to § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, remedial redistricting plans adopted by a federal court do not need to receive preclearance from the Attorney General or a special three-judge federal court in the District of Columbia; and second, "when a federal court must devise its own remedial plan, it is necessary to determine whether the proposed remedial plan is 'court ordered' or 'legislative', to determine whether at-large districts may be included." (DNC Mem., at 10–11). Notwith-

standing the facts that the theory underpinning the first example is falsifiable since § 5's preclearance requirements do not apply to all State legislatures and that the second example implicitly recognizes that a court can act in a legislative capacity in fashioning a redistricting plan, the DNC's position is positively unavailing in light of the Supreme Court's pronouncements in *Upham*, *Wise*, and *Connor* (none of which was properly cited in the DNC's brief).

**39.** State legislatures in California, Florida, Illinois (repeatedly), and most recently Georgia, among others, have inexcusably abandoned their constitutional redistricting duties to the courts.

be applied to court-ordered reapportionment plans drawn predominately on the basis of race.[40]

The defendant-intervenors and Democratic National Committee, as *amicus curiae*, nonetheless argue that a lesser standard of review should be applied to court-ordered remedial redistricting plans, *citing DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal.1994).[41] This case is both factually and legally distinguishable. In 1991, the California Supreme Court appointed a panel of Masters to develop and recommend a redistricting plan after the governor vetoed the legislature's reapportionment plan and legislative malaise set in. 856 F.Supp. at 1410. The Masters conducted public hearings and submitted a report and recommendation to the California Supreme Court, which the Supreme Court adopted. *Id.* (*citing Wilson v. Eu*, 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (1992)). A California registered voter subsequently challenged the court-ordered redistricting plan, claiming that it "relied on race-conscious reapportionment and diluted white voter strength in violation of the Equal Protection Clause of the Fourteenth and Fifteenth Amendments." *Id.* The district court granted summary judgment for the State, concluding that the redistricting plan did not fall within the parameters of *Shaw v. Reno*.

The *DeWitt* court, citing with approval the California Supreme Court's findings in *Wilson v. Eu*, concluded that "[n]o bizarre boundaries were created" and that "the Master's Report sought to balance the many traditional redistricting principles, including the requirements of the Voting Rights Act." 856 F.Supp. at 1413. The court framed the issue as follows:

> This case . . . involves the constitutionality of a redistricting plan that created majority-minority districts in a manner that was consistent with traditional redistricting principles, not based solely on race, and not involving extremely irregular boundaries. It involves the question left open by the Court in *Shaw*.

*Id.* The *DeWitt* court concluded that the plaintiff failed to state a claim for racial gerrymandering because

> the Masters did not draw district lines based deliberately and solely on race, with arbitrary distortions of district boundaries. The Masters . . . properly looked at race, not as the sole criteria in drawing lines but as one of the many factors to be considered. We agree with the California Supreme Court that the Masters' Report evidences a judicious and proper balancing of the many factors appropriate to redistricting. . . .

*Id.* It further held that "in the context of redistricting, where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act, . . . strict scrutiny is not required." *Id.* at 1415.

The Democratic National Committee reasons that since the Supreme Court summarily affirmed the decision in *DeWitt* on the same day that it decided *Miller v. Johnson*, it must have intended not to subject the court-ordered redistricting plan to the "pre-

---

**40.** In *Croson*, the Supreme Court observed that "[t]he purpose of strict scrutiny is to smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." 488 U.S. at 493, 109 S.Ct. at 721. Citing this language, the defendant-intervenors argue that strict scrutiny is more suited for legislative action than federal court action. While this observation may be generally true, it is not without exception. In *Miller*, the Court concluded that a plaintiff could establish that racial considerations predominated either through circumstantial evidence of shape and demographic factors or through direct evidence of the legislature's purpose. 515 U.S. at 915–17, 115 S.Ct. at 2488. Given these differing methods of proof, strict scrutiny would not "entail the in-depth examination of the federal court that ordered the plan"

envisioned by the defendant-intervenors where a plaintiff relies on circumstantial evidence to challenge the court-ordered redistricting plan. In fact, it has already been determined in *Johnson v. Mortham*, that a court-ordered remedial congressional redistricting plan adopted in 1992 will be subjected to strict scrutiny under the standards articulated in *Miller*. *See Johnson*, 915 F.Supp. 1529 (N.D.Fla.1995) (discussed in footnote 18 *supra* ).

**41.** The United States Supreme Court summarily affirmed the decision in *DeWitt* on the same day that it issued its decision in *Miller v. Johnson*. *See* 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995) (affirming *DeWitt* in part and dismissing the appeal in part).

dominant use of race test" announced in *Miller*. The DNC therefore speculates that if the Supreme Court had intended to subject a court-ordered plan to the same strict scrutiny applied in *Miller* to a legislatively enacted redistricting plan, the Court would have vacated the *DeWitt* decision and remanded it for further proceedings in light of *Miller*. Such a speculative inference is patently unreasonable given the *DeWitt* court's express findings that traditional race-neutral districting principles were not subordinated to racial considerations in the redistricting process. To the contrary, a much more reasonable (and indeed more probable) inference to be drawn from the timing and texts of the *Miller* and *DeWitt* decisions is that the *Miller* Court implicitly recognized the facts and holding of *DeWitt* when it wrote:

> Where these [traditional districting principles] or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can 'defeat a claim that a district has been gerrymandered on racial lines.'

*Miller*, 515 U.S. at 916, 115 S.Ct. at 2488 (*citing Shaw*, 509 U.S. at 647–48, 113 S.Ct. at 2827). *DeWitt* does not establish that court-ordered redistricting plans avoid strict scrutiny; rather, it completes the rule announced in *Shaw* and *Miller*. That is, strict scrutiny will only apply where racial considerations predominate over traditional race-neutral districting principles.

This court therefore concludes that since racial considerations predominated over all other factors in the configuration of the Fourth Congressional District adopted by the *Hastert* court (*see infra* section III.B), the court-ordered plan must be subject to strict scrutiny.

B. Racial Considerations Predominated in Configuring the Fourth Congressional District

▪ The Supreme Court in *Miller* identified two means of establishing that race predominated over all other considerations in the drawing of district boundaries; namely,

circumstantial evidence of a district's shape and demographics or direct evidence of the legislative purpose. Since the Illinois General Assembly did not create the majority-minority Hispanic Fourth Congressional District, King's only apparent recourse was to prove that the *Hastert* court adopted a racially based redistricting plan through circumstantial evidence. Establishing that racial considerations predominated over all of the other complex factors involved in redistricting through indirect, inferential evidence is an extremely difficult burden under any set of circumstances. Establishing that race predominated in a *court-ordered* redistricting plan would normally make this burden exponentially more difficult. Three factors, however, eased rather than enhanced the difficulty of King's burden: first, the *Hastert* court employed a unique process to select a redistricting plan; second, the *Hastert* court found that the Fourth Congressional District was bizarrely configured; and third, the *Hastert* court did not make any findings of fact to explain how and why the district's boundaries came to have such a bizarre configuration. The interplay of these three factors enabled King to fulfill his burden.

1. The Unique Process of Selecting a Redistricting Plan [42]

At the onset of the consolidated *Hastert* proceedings, the various litigants presented six different reapportionment plans to the court for consideration. Due to significant time constraints, the court did not have the option of bifurcating the proceedings to separately decide the legal issues (*e.g.*, the constitutionality of the existing plan; whether Section 2 of the Voting Rights Act required the creation of an Hispanic majority district) and the appropriate remedy. The court thus was unable to conduct hearings (or appoint a Master to do the same) to consider the merits and constitutionality of each of these submitted plans. The court instead adopted streamlined discovery and trial procedures which facilitated and condoned the pre-trial resolution of disputed issues by the litigants.

42. Although this court has previously set-forth a detailed summary of the *Hastert* court proceedings, *see supra* part III, the *Hastert* court's methodology bears repeating to demonstrate more precisely the consequences of that methodology on this court's decision.

Two of these pre-trial agreements are particularly important to this analysis: first, the parties universally agreed that population and demographic changes "mandated the creation of an Hispanic majority district;" and second, the parties agreed in principle to the configuration of the proposed Hispanic district. As a result of other pre-trial agreements, the parties revised and eliminated competing redistricting plans until only two remained for the court's consideration. The court's primary task at trial was thus narrowed to determining which of these two revised plans better met constitutional and statutory requirements. Since the configuration of the Fourth Congressional District was virtually the same regardless of which proposed plan the court adopted, the district's bizarre shape was effectively determined by the *litigants* and not the court.[43] Under these circumstances, the litigants' intentions and purpose become an important source of information on the role that race played in the configuration of the boundaries' borders.[44]

### 2. The Bizarrely Drawn District

■ The Fourth Congressional District is an uncouth configuration: a Rorschach ink blot turned on its side; a wobbly eighth note; an unusually shaped bar-bell. However it is characterized, its shape is bizarre. The District's extremely irregular configuration create, a strong inference (but not a presumption) that its shape rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race. *See, e.g., Miller,* 515 U.S. at 912–13, 115 S.Ct. at 2486 (shape may be persuasive circumstantial evidence that race for its own sake was the dominant rationale in the drawing of district lines); *Shaw,* 509

U.S. at 645–49, 113 S.Ct. at 2826–28; *Johnson v. Mortham,* 915 F.Supp. 1529, 1550–51 (N.D.Fla. 1995) (evidence of bizarre configuration by itself was sufficient to establish racial gerrymander).

### 3. The Lack of Findings of Fact by the *Hastert* Court

An important effect of the streamlined *Hastert* pre-trial and trial procedures was the transfer of many of the court's fact finding responsibilities to the parties. As a result of these streamlined procedures, a significant part of the evidentiary portion of the trial was eliminated through stipulation. The *Hastert* court frequently acknowledged that the parties had resolved complex issues via stipulation but the court failed to address or recite the factual predicate underpinning the stipulations. While this practice may have been appropriate under the pressing time constraints in 1991, it has had the collateral effect of limiting the factual record upon which this court must rely to evaluate King's claim.

This court's task is to determine what role racial considerations played in the configuration of the Fourth Congressional District's boundaries. In doing so, this court is confined to the factual determinations made by the *Hastert* court as set forth in that court's opinion. This court cannot retroactively supplement the *Hastert* court's factual record. As such, unless the *Hastert* court made a specific finding (*e.g.,* socio-economic factors were considered in drawing the district's boundaries), the default rule must be that the *Hastert* court did not consider the role that the particular factor played in the district's bizarre configuration. This default rule is required to ensure that the court-ordered

---

**43.** While it is true that the *Hastert* court affected the shape of the Fourth Congressional District by selecting the proposed *Hastert* plan over the *Rosebrook* plan, the demonstrable impact of that choice on the configuration of the district's boundaries was *de minimis.* The *Hastert* court thus did not understate the impact of the parties' pre-trial agreement on district's configuration when it observed that this agreement may have been "the crucial factor in facilitating the creation of an Hispanic district."

**44.** The defendant-intervenors caution against relying extensively on such evidence because the court ultimately selected the plan and its motivations for doing so may have differed substantially from the drafters' intentions. This court will defer to the reasons expressed in the *Hastert* opinion concerning why that court adopted the proposed *Hastert* plan over the proposed *Rosebrook* plan. Where, however, the *Hastert* court did not make any specific findings that contradict or undermine the expressed intent of the litigants, this court will consider evidence relating to their intent.

redistricting plan is "free from any taint of arbitrariness or discrimination." *See Connor*, 431 U.S. at 415, 97 S.Ct. at 1834.

### 4. Application

■■■ Almost from the outset of the *Hastert* litigation, the litigants agreed to create an Hispanic majority-minority district. This agreement is not, however, sufficient to establish that racial considerations predominated over all other factors in the creation of the district's actual borders. The focus here is not on the justifications supporting the creation of an Hispanic majority district but rather on how the specific boundaries of the Fourth Congressional District came to be drawn. While the *Hastert* opinion provides a broad perspective on the factors facilitating the adoption of the Hispanic district, the court did not make any specific findings explaining how or why the district's specific boundaries came to exist. This omission notwithstanding, the only reasonable conclusion that can be drawn from the shape and demographics of the district is that racial considerations predominated over all other factors in the configuration of the Fourth Congressional District.

First, the pragmatic requirements of creating *four* super-majority minority districts located principally within the City of Chicago necessarily forced the map makers to draw district boundaries with race as a major consideration.[45] As the *Hastert* court revealed, the goal of the litigants was to create a new Hispanic majority district while maintaining the three African–American super-majority districts (*i.e.*, the First, Second and Seventh Congressional Districts) created by federal court order in 1981. Substantial demographic changes in the city's minority population during the 1980s made accomplishing this goal a particularly difficult task. While the Hispanic population generally grew, the three majority African–American districts created in 1981 experienced significant losses in population, especially African–American population. *See Hastert*, 777 F.Supp. at 646 n. 19. In addition, the African–American population generally moved south. *Id.* These demographic changes caused the litigants to "radically alter" the configuration of the three 1981 African–American districts to ensure that an African–American population of 65% or more could be maintained in each of the First, Second and Seventh Congressional Districts.[46] *Id.* Since the city's minority population is finite and the constitutional requirement of one person-one vote unforgiving in its application, the radical alteration of the three African–American super-majority districts necessarily affected the boundaries of the Hispanic majority district. The result was inevitable: a bizarrely drawn Hispanic district whose boundaries were created to maximize its Hispanic population while permitting the African–American super-majority districts with which it shared common borders to maximize their respective African–American populations in order to achieve the desired 65% minority population threshold in each district.[47]

Second, the only factor that consistently explains the precise configuration of the district's boundaries is race. The Defendant-intervenors correctly point out that traditional non-racial districting principles were considered in the configuration of the Fourth Congressional Districts. Affidavits submit-

---

**45.** As previously noted, a super-majority African–American district contains an African–American population that represents 65% of the district's total population and 60% of its voting age population. A super-majority Hispanic district contains the same ratios of Hispanic population. According to the *Hastert* court, these population ratios are required to ensure a safe minority congressional seat. 777 F.Supp. at 647 & n. 20.

**46.** The litigants substantially agreed prior to trial to the reconfiguration of the Second Congressional District, *id.* at 640, and apparently reached an agreement in principle on the reconfiguration of the First and Seventh Congressional Districts, save for the placement of Chicago's politically influential Second Ward.

**47.** The *Hastert* court acknowledged as much, stating:

> The location of the Chicago Hispanic community in two highly concentrated enclaves on either side of the Seventh Congressional District on Chicago's near northwest and near southwest sides necessarily requires an odd configuration to accommodate the creation of an Hispanic district and the three super-majority African–American districts dictated under the Voting Rights Act.

777 F.Supp. at 650.

ted into evidence establish that the litigants, at least at the outset of the *Hastert* litigation, considered factors such as compactness, contiguity, respect for political subdivisions and communities of shared interests in the initial configuration of the Fourth Congressional District. However, it is the degree of consideration, and not the mere fact of consideration, that is crucial.

 To a certain extent, the clustering of Hispanics into two densely populated enclaves provided map makers with the luxury of resorting to traditional districting principles. It is not surprising to find that a comparatively small district with two densely packed minority enclaves is (excluding the connector) more compact and more respectful of political subdivisions than a larger district drawn to capture a more dispersed minority population.[48] District to district comparisons do not, therefore, necessarily inform the court of the role played by traditional districting principles in the configuration of the Fourth Congressional District. Rather, the inquiry must neces-

sarily focus on the manner in which the boundaries are drawn to determine whether a rational pattern emerges to explain the district's configuration on grounds other than race (*e.g.,* do the intricately shaped boundaries follow or cross precinct borders? ward borders? natural or man-made barriers?, *etc.*). If race is considered with other factors of equal or greater weight, the configuration of the district should have some objectively verifiable explanations (*e.g.,* the border in part separates traditionally Democratic and Republican Party electoral strongholds). If an objectively determinable pattern does not emerge based on non-racial districting factors, the only plausible explanation of the district's configuration is race. Alternatively stated, the question is whether racial considerations substantially explain the configuration of the district's borders; if the answer is yes, racial considerations will have predominated.

In this case, a careful analysis of the Fourth District's boundaries establishes that they were drawn to maximize the percentage of Hispanics located within the district.[49] As

---

**48.** In the context of assessing the *Gingles* threshold requirements of a § 2 Voting Rights Act claim, the *Hastert* court found that the "Chicago/Cook County Hispanic community is sufficiently large and geographically compact to constitute a single district majority." This finding does not establish, however, that the *Hastert* court also found that the district drawn to accommodate this community was compact. For example, a fairly small rectangle can be drawn around the two enclaves on the near northwest and near southwest sides of the city that would include a substantial majority of the Hispanic population within the City of Chicago. This rectangle serves as evidence of the Hispanic community's geographic compactness. The Fourth Congressional District, however, would not fit within the area of this same rectangle: neither the western connector nor the two promontory points jutting out of the district's two core areas fall inside this rectangle. The finding of geographic compactness to satisfy a *Gingles* threshold factor thus does not correspond to a separate finding that the Fourth Congressional District was also compact.

The *Hastert* court did not make any findings concerning the compactness of the Fourth Congressional District. Under the default rule previously articulated, this court must conclude that compactness was not considered in the configuration of the Fourth Congressional District. In any event, this court finds that the Fourth Congressional District is not visually compact. *See Schrage v. State Bd. of Elections,* 88 Ill.2d 87, 98,

58 Ill.Dec. 451, 455, 430 N.E.2d 483, 487 (1981) (recognizing visual inspection as appropriate means for evaluating compactness); *Martin v. Soucie,* 109 Ill.App.3d 731, 734–35, 65 Ill.Dec. 339, 341–42, 441 N.E.2d 131, 133–34 (1982). In addition, unless the court completely discounts the 4.7% of the district's population dispersed throughout the western connector, the district is not functionally compact either.

**49.** As adopted in 1991, the Fourth Congressional District has a total population of 571,530; of this amount, Hispanics account for sixty-five (65%) of the total population and fifty-nine (59%) of the voting age population. Over ninety-five percent (95%) of the district's population lives within the two core areas of the district located on the near northwest and near southwest sides of the city. The remaining 4.7% of the district's population lives within the narrow, C–shaped "western" connector that runs around the northern, western and southern borders of the Seventh Congressional District. Central Avenue in the City of Chicago serves as the dividing line between the western connector and the two core areas. The western connector, which contains a significant amount of vacant land, park land, cemeteries and industrial areas, connects the district's northern and southern core areas and thereby serves as a land bridge to ensure the district's contiguity.

This contiguity, however, is "hypertechnical[ ] and ... cynical[ ]," *see Hays v. State of Louisi-*

King's witness Cleveland testified, the lines of the Fourth Congressional District follow the concentrations of the Hispanic population with "exquisite" detail. The district's boundaries were drawn at the census block level, which roughly corresponds to a city block.[50] While the map makers had to use census block data to ensure population equality, the census block data contained racial data at the city block level. This data permitted the map makers to draw the district's boundaries on a block-by-block basis in order to maximize the concentration of Hispanics within the district. As a result, when a map of the Fourth Congressional District is superimposed over a map showing the concentration of the Hispanic population drawn at the census tract level, the district map "includes virtually all areas of high percent Hispanic concentration on the northern ... part of the City of Chicago as well as virtually all of the areas of high Hispanic concentration on the southern part of the City of Chicago." (Def. Int. Exh. 12, at 105). The same is true when the exercise is repeated at the census block level based upon the percentage of Hispanic concentration, *see* (Def. Int. Exh. 4, Map 1), and when Latino plurality block groups are considered.[51] (*Id.*, Map 2).

This close correlation is not surprising given the racial demographics of the city discussed earlier. Indeed, the *Hastert* court expressly found that racial considerations dictated the configuration of the two append-

ages jutting out of the district's two core areas. The court stated in this regard:

> To ensure a sufficient Hispanic concentration within the proposed district, both maps shoot rays out from the northwest and southwest enclaves *to capture additional Hispanic population.*

*Hastert*, 777 F.Supp. at 648 n. 24 (emphasis added). Portions of the western connector are also explainable only on racial grounds. For example, the portion of the Stickney township included in the Fourth Congressional District is 81.6% Hispanic and only 14.5% white while the portion of the township allocated to the Third Congressional District is 5.5% Hispanic and 93.2% white. Similarly, in Proviso Township, 57% of the township population included in the Fourth Congressional District is Hispanic and 36.6% is white while the portion of the township included in the Third Congressional District is 4.9% Hispanic and 79.3% white.

The evidence also establishes that the boundaries of the Fourth Congressional District split a number of political subdivisions, including: eight (8) townships—six (6) of which have population in the district; eighteen (18) municipalities—sixteen (16) of which had population in the district; twenty (20) aldermanic wards; and two-hundred eighteen (218) precincts.[52] With the exception of precincts, other Illinois congressional districts split a comparable or greater num-

ana, 839 F.Supp. 1188, 1200 (W.D.La.1993), since it is preserved through the use of non-populated parks and barren industrial areas.

50. The 1990 Bureau of Census computer tapes divide census data into different units of aggregation. The most elementary level is the census block, which lists the population, voting age population and racial make-up of each city block. The next level of data aggregation is the census group block, which provides socio-economic data for larger groups composed of multiple census blocks. The district's boundaries do not conform to but rather split at least 150 census group blocks. For this reason, the district cannot have been drawn at the census group block level.

51. The former measure examines the percentage of Hispanics in any given census block (*e.g.*, 40% of the block's population is Hispanic) while the latter measure examines the racial composition of the entire census block. An Hispanic plurality census block exists when the largest population

group among all the racial groups living within that block is Hispanic.

52. These numbers were based upon the wards and precincts that existed at the time of the *Hastert* litigation. In 1992, the wards and precincts were realigned. Although Mr. Cleveland did not determine the number of wards split by the Fourth Congressional District after the realignment, he did disclose that the Fourth Congressional District split only sixty-one (61) of the realigned 1992 precincts. Mr. Cleveland's analysis properly focused, however, on the ward and precincts that existed at the time of the *Hastert* proceedings, since these were the only boundaries the map makers could have considered. In addition, it would be improper to consider the effect of the 1992 realignment, since it would be impossible to isolate what effect, if any, the Fourth Congressional District's boundaries adopted in 1991 had on the map makers who redrew the wards and precincts in 1992.

ber of subdivisions compared to the Fourth District: the Third, Sixth and Eleventh Districts split a similar number of townships (9, 8 and 7, respectively); the Second, Third, Sixth, Eighth, Eleventh and Thirteenth Districts all split more municipalities; and the First and Seventh Districts split a comparable number of aldermanic wards (19 and 15, respectively). This data, however, is of extremely limited usefulness because there is no meaningful standard against which it is to be measured. The data permits the uncertain conclusion that compared to other Illinois congressional districts, the map of the Fourth Congressional District did not excessively split political subdivisions. But this conclusion does not mean that respect for political subdivisions was not subordinated to racial considerations within the context of the Fourth Congressional District's boundaries. The data submitted does not inform the court one way or the other on this inquiry, and is therefore disregarded.[53]

The defendant-intervenors also argue that the district's configuration may be explained by socio-economic factors. To that end, Dr. David Garth Taylor testified at trial that the city's Caucasian, Hispanic and African–American populations have substantially different socio-economic status when home ownership, income, labor force participation, education and poverty levels are considered. Since the Fourth Congressional District is sixty-five percent (65%) Hispanic, it is not surprising that superimposing the socio-economic data onto maps of the city's congressional districts reveals that the electorate of the Fourth District have more socio-economic characteristics in common than the electorate of adjacent congressional districts. This observation notwithstanding, the socio-economic data does not explain the district's configuration. First, the socio-economic data was only available at the census group block level while the district was drawn at the smaller census block level. The defendant-intervenors have thus not shown that the socio-economic factors analyzed by Dr. Taylor were available or used at the time of the district's configuration.[54] Second, the *Hastert* court did not make any findings of fact concerning what role, if any, socio-economic factors played in the drawing of the district's boundaries. Hence, at best, the socio-economic model can only retrospectively explain the district's configuration but cannot demonstrate that the socio-economic data actually played a role in the configuration of the district's boundaries. Thus, while the socio-economic data establishes that the Hispanic community faces common issues, it fails to demonstrate that racial considerations did not predominate in the drawing of the district's actual boundaries. *See also Vera v. Richards*, 861 F.Supp. 1304, 1338 (S.D.Tex. 1994), *cert. granted* 515 U.S. 1172, 115 S.Ct. 2639, 132 L.Ed.2d 877 (1995) (same result); *Hays v. State of La.*, 839 F.Supp. 1188, 1203 (W.D.La.1993) (same).[55]

Accordingly, this court concludes that racial considerations predominated in the configuration of the Fourth Congressional District, which was adopted but not drawn by the *Hastert* court.

## IV. Strict Scrutiny

■ Having concluded that racial considerations predominated, this court must now subject the Fourth Congressional District to strict scrutiny; the district will only pass constitutional muster if it is narrowly tailored to serve a compelling state interest. Submitting a redistricting plan to strict scrutiny does not automatically toll the bells. The Supreme Court in *Adarand Constructors, Inc. v. Pena* most recently sought "to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" 515 U.S. 200, 237, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995) (citation omitted).

---

**53.** The *Hastert* court did not make any findings on this issue.

**54.** According to Cleveland, King's expert, this data was not published by the Census Bureau until May 15, 1992, almost six months after the *Hastert* court issued its decision. Whether this information was available to the *Hastert* litigants is not known.

**55.** *Vacated Louisiana v. Hays*, 512 U.S. 1230, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994), *on remand, Hays v. State* of La., 862 F.Supp. 119 (W.D.La. 1994), *vacated United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), *on remand Hays v. State of La.*, 936 F.Supp. 360 (W.D.La. 1996).

The defendant-intervenors contend that the *Hastert* court found and articulated a compelling government interest justifying the racially based configuration of the Fourth Congressional District; namely, remedying a potential violation of Section 2 of the Voting Rights Act. King raises two arguments in response: first, the *Hastert* court erred in finding that Section 2 of the Voting Rights Act required the creation of an Hispanic majority district; and second, remedying a Section 2 violation is not a compelling government interest. Since the Supreme Court has not yet decided the latter proposition, prudence dictates that this court should address and resolve King's first argument before considering what is really the threshold argument for this strict scrutiny analysis.

A. Whether the *Hastert* Court's Section 2 Finding Was Clear Error

The passage of time since the *Hastert* decision was announced in 1991 has provided this court with a unique vantage point from which to assess the validity of King's allegations of error. More specifically, two congressional elections have been held since 1991; in both elections, an Hispanic candidate was elected to Congress from the Fourth Congressional District. These electoral results minimize in many respects the force of King's arguments that the *Hastert* court erred in finding that the three *Gingles* prerequisites were satisfied. The Supreme Court in *Growe v. Emison* recently reiterated the reasons for the *Gingles* threshold requirements:

> The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single member district, *see Gingles*, 478 U.S. at 50 n. 17 [106 S.Ct. at 2765 n. 17]. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive mi-

nority vote by submerging it in a larger white voting population, *see Gingles, supra*, at 51 [106 S.Ct. at 2766].

507 U.S. 25, 40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993). The *Hastert* court's conclusions about the potential of the Hispanic electorate to elect a representative of its own choice have proved prescient in light of the 1992 and 1994 congressional election results. These same electoral successes, however, are fundamentally at odds with the purpose of the majority bloc voting prerequisite. While non-Hispanic racial bloc voting patterns did not thwart the election of the Hispanic's candidate of choice in the 1992 and 1994 congressional elections, discounting the effect of racially polarized voting based upon these two election results would be premature. The *Hastert* court found racial bloc voting at the federal, state and local levels; the framework for assessing the third *Gingles* prerequisite is thus broader than congressional elections. As the Supreme Court has recognized, "[t]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim." *Johnson v. DeGrandy*, 512 U.S. 997, 1007, 114 S.Ct. 2647, 2655, 129 L.Ed.2d 775 (1994) (*quoting Voinovich v. Quilter*, 507 U.S. 146, 156–58, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993)). The *Gingles* prerequisites must nevertheless be clearly established. To that end, the Supreme Court has admonished that racial bloc voting and minority group political cohesion can never be assumed but must be specifically proven in each case.[56] *Growe*, 507 U.S. at 41–42, 113 S.Ct. at 1085.

King first argues that the *Hastert* court erred in finding that the Hispanic community was sufficiently numerous to constitute a majority in a properly drawn district. The genesis of this alleged error was the *Hastert* court's failure to determine the proper *eligible* minority voting population, which King defines as Hispanic citizens of voting age. *See Campos v. City of Houston*, 894 F.Supp. 1062, 1065 (S.D.Tex.1995) (data on voting age

---

**56.** The district court must make specific findings to support each *Gingles* prerequisite. *See Statewide Reapportionment Advisory Comm. v. Theodore*, 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993) (where the Court adopted the position advanced by the Solicitor General that the three

judge panel had given inadequate consideration to and made inadequate findings concerning § 2 of the Voting Rights Act and remanded the case for further development of the record in accordance with the points raised in the Solicitor General's *amicus* brief).

Hispanic citizens is the proper measure of an Hispanic population's ability to create a majority voting district); *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir.1989) (affirming district court's conclusion that none of the proposed districts had a majority Hispanic population once citizenship and voting age were considered); *see also Vera v. Richards*, 861 F.Supp. 1304, 1340 n. 49 (S.D.Tx.1994) (while noting that Section 2 vote dilution claims "are ordinarily premised on measures of citizen voting age population," the court assumed for equal protection purposes that "Hispanics are Hispanics, whether citizens or not"), *cert. granted* 515 U.S. 1172, 115 S.Ct. 2639, 132 L.Ed.2d 877 (1995).

Other courts have agreed in principle that only eligible minority voters should be considered in determining numerosity; however, these courts have defined eligible minority population to mean minority voting age population. *See, e.g., McNeil v. Springfield Park Dist.*, 851 F.2d 937, 944–45 (7th Cir.1988), *cert. denied* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Ketchum v. Byrne*, 740 F.2d 1398, 1412 (7th Cir.1984); *League of United Latin Am. Citizens v. North East Indep. School Dist.*, 903 F.Supp. 1071, 1084 (W.D.Tex.1995) (noting that with the exception of *Campos*, the district courts in the Fifth Circuit consider voting age population in evaluating the first *Gingles* prerequisite). The Seventh Circuit in *McNeil* explained the

reason for the voting age population limitation as follows:

> Read literally, the *Gingles* population requirement could be construed to require that the minority group constitute a majority only of the total population in a proposed single-member district. Substantial evidence and common sense, however, dispute this construction. . . . The threshold requirement roughly measures minority voters' potential to elect candidates of their choice. Because only minorities of voting age can affect this potential, it is logical to assume that the Court intended the majority requirement to mean a voting age majority. Viewed another way, those ineligible to vote have not experienced a dilution of their vote. They are not parties to a Section 2 claim.

851 F.2d at 945. The Seventh Circuit has not yet addressed whether citizenship should also be considered a component of voter eligibility for the *Gingles* population requirement.[57] The Supreme Court has also not decided this issue. *See DeGrandy*, 512 U.S. at 1007–10, 114 S.Ct. at 2655–56; *Growe*, 507 U.S. at 39 n. 4, 113 S.Ct. at 1083 n. 4.

This court too declines to resolve this question since King has not established via competent evidence that the Hispanic citizen voting age population falls below fifty percent.[58] Hence, regardless of which measure

---

57. The Seventh Circuit in *Ketchum* flirted with the idea of considering citizenship as a measurement of population, *see* 740 F.2d at 1415 (advising district court that it could consider whether the Hispanic wards on the Southwest Side should have their majorities calculated on the basis of "only those individuals who are eligible, as citizens, to vote"), but it did so because "there should be an appropriate corrective for non-citizenship." *Id.* at 1415 n. 19.

58. The 1990 census data reported that 194,438 of the 345,307 Hispanic residents in the City of Chicago were United States citizens, or 56.30%. This data, however, was not available at the time of the *Hastert* decision.

The census report notwithstanding, King's witness Cleveland, testified at trial that only forty-five percent (45%) of the Fourth Congressional District's Hispanic population were citizens. There are simply too many uncertainties surrounding the validity of the data used by King to warrant such a conclusion. First, the 1990 census data was reported at the census block group

level rather than the census block level. The Fourth District's boundaries were drawn, however, at the smaller census block level and split at least 150 census group blocks. Second, the census reported citizenship data was based on sample data rather than on 100% enumeration, the basis upon which total population and voting age population are reported. Third, Cleveland admitted that the census data provided only a snapshot view of citizenship levels in 1990, and thus did not take into account changes in citizenship levels since 1990 due to naturalization and the amnesty program of the Immigration and Naturalization Control Act of 1986. Indeed, Dr. Taylor testified on behalf of the defendant-intervenors that a large number of persons granted amnesty under that Act resided in zip code areas located within the northern and southern areas of the Fourth District. Cleveland's calculations did not compensate for amnesty programs, and likewise did not account for either an overreporting or underreporting of citizenship data. Based on these flaws, this court declines to find that the

this court uses—total population, voting age population, or citizen voting age population—the *Hastert* court properly found that the City of Chicago/Cook County community was sufficiently numerous to constitute a majority in a properly drawn district. The congressional election results of 1992 and 1994 serve to confirm this conclusion.

King next contends that the *Hastert* court erred in finding that the Hispanic community was politically cohesive. The premise of his argument is that the Puerto Rican and Mexican–American communities, which together account for the overwhelming majority of Chicago's Hispanic community, have different cultural, social, political and economic concerns that serve to separate rather than unify the Latino community. King further contends that these differences have manifested themselves in ethnically polarized bloc voting: Mexican–Americans predominately vote for Mexican–American candidates while Puerto–Ricans predominately vote for Puerto Rican candidates. The lay opinion elicited by King at trial to demonstrate and substantiate the claimed lack of cohesion was mainly anecdotal, often incredible, and wholly insufficient to support the inferences and conclusions King seeks to draw. King has thus failed to establish that the *Hastert* court's finding of political cohesiveness was clearly erroneous. He has likewise failed to establish that the circumstances have changed in any quantifiably significant measure since 1991.[59]

King also argues that changed circumstances since 1991 have lessened white racial bloc voting, such that "it is now a rare case that an Hispanic candidate of choice is defeated as a result of racial bloc voting." Neither proposition advanced by King is supported by recent city-wide election results or meaningful statistical analysis. Since 1988, only three Hispanic candidates have been elected in citywide elections. Two Hispanic judges were elected in 1988 and 1990; however, both candidates won with less than a majority of the vote due to a splintering of votes among multiple white candidates. In addition, Miriam Santos, an Hispanic, was elected as city treasurer in 1991; however, Ms. Santos had been slated for this position by the Chicago Democratic Party and she ran on a slate that included incumbent mayor Richard Daley. Ms. Santos subsequently ran as an incumbent in 1995 and was reelected. With the exception of Ms. Santos, the Democratic Party has not slated an Hispanic candidate for alderman, state senate, state representative, or congress in any district with a white majority voting age population.

King's proposition is also statistically invalid. The results of Dr. Allan J. Lichtman's ecological regression analysis and extreme case performance of forty-one elections held between 1983 and 1995 establish a definite and continuing pattern of white racial-bloc voting against Hispanic candidates.[60] Dr. Lichtman's analysis reveals that "since 1987, Hispanics have been elected in every election district for every type of office with a voting age majority of Hispanics, but not in any district lacking such a majority." Based upon these results, Dr. Lichtman concludes that "Hispanics in the City of Chicago would have a reasonable opportunity to elect a candidate of their choice to Congress only in a

Hispanic citizenship rate in the Fourth Congressional District was approximately forty-five percent (45%) either in 1990 or today.

**59.** To the contrary, the factual record is replete with testimony establishing the political and social cohesiveness of the Hispanic community. State Senators Jesus Garcia and Miquel Del Valle both testified about the common political concerns of the Mexican–Americans and Puerto–Ricans and their joint efforts to represent the entire Latino community in the Illinois General Assembly. Congressman Luis Guttierrez likewise identified common political, economic and social concerns that affect both Mexican–Americans and Puerto–Ricans. Dr. Felix Padilla, a respected sociologist and ethnographer, also testified at length about the historical as well as

present-day solidarity and cohesiveness of the Chicago Latino community.

**60.** Dr. Lichtman studied precinct-by-precinct election returns for 41 partisan and non-partisan (*i.e.*, City Council) elections involving Hispanic and non–Hispanic candidates in the City of Chicago from 1983 to the present in which the losing candidate, whether Hispanic or not, received at least fifteen percent of the vote.

In addition, Dr. Lichtman supplemented his ecological regression and extreme case analysis by examining the squared correlation coefficients. This value is used to assess the strength of association between two variables.

district with a voting-age majority of Hispanics."

While Ms. Santos's electoral success raises hopes for a color-blind slating and election processes in the future, the problems of racial bloc voting and exclusion of Hispanics from the powerfully important slating process remain. The *Hastert* court thus properly found that the third *Gingles* factor was satisfied in 1991, and King has not established any present day change in circumstances that would warrant a contrary finding.

■ King finally argues that the Fourth Congressional District was not sufficiently compact to create a separate Hispanic District. To demonstrate this point, King argues that the 743-sided district is neither visually nor mathematically compact. Once again, King has confused the *Gingles* threshold requirement of geographical compactness with the principle of compactness used to assess whether racial gerrymandering has occurred. *See supra* footnote 48. The question raised by *Gingles* is whether the minority population (and not the district drawn to accommodate that population) is geographically compact and sufficiently numerous to constitute a majority in a single member district. This measure of geographical compactness thus concerns whether a Section 2 violation has occurred; the second measure of compactness (*i.e.,* as a traditional race-neutral districting principle) concerns whether the district drawn to remedy the Section 2 violation satisfies the requirements of the Equal Protection Clause. To conflate the two into a single measurement confuses the liability with the damages analysis, and represents an unwarranted extension of *Shaw*. But see *Reed v. Town of Babylon*, 914 F.Supp. 843, 871 (E.D.N.Y.1996) (where the court applied the principles established in *Shaw* to the first *Gingles* prerequisite, and concluded that "the plaintiffs must, in order to meet their burden of proof under the first *Gingles* precondition, either proffer a districting plan which does not subordinate ra-

cial considerations to traditional districting principles, including compactness . . ., or justify the need for such subordination") (citations omitted). This court accordingly concludes that the *Hastert* court's finding of geographic compactness was appropriate.

Since King has limited his challenges to the *Hastert* court's findings concerning the existence of the three *Gingles* prerequisites, this court will not undertake to review or supplement the prior court's findings with respect to the totality of circumstances test.[61] The *Hastert* court properly held an Hispanic majority district was warranted under Section 2 of the Voting Rights Act.

## B. Whether Remedying a Section 2 Violation is a Compelling State Interest

Section 2 of the Voting Rights Act prohibits "any practice or procedure that, 'interacting with social and historical conditions,' impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993) (*quoting Gingles*, 478 U.S. at 47, 106 S.Ct. at 2764); *accord DeGrandy*, 512 U.S. at 1007–08, 114 S.Ct. at 2655. Because the purpose of Section 2 is "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race [or] color . . .' ", *Voinovich*, 507 U.S. at 152, 113 S.Ct. at 1154–55 (*quoting* U.S. Const., Amdt. 15), state actors have frequently argued that a racially based redistricting remedy under Section 2 serves a compelling government interest. *See, e.g., Quilter v. Voinovich*, 912 F.Supp. 1006 (N.D.Ohio), *appeal dismissed* —— U.S. ——, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995); *Shaw*, 861 F.Supp. at 437; *Hays v. State of La.*, 839 F.Supp. 1188, 1217 (W.D.La.1993) (Walter, J., concurring). The Supreme Court, however, has not yet decided whether "compliance with the Voting Rights Act, standing alone, can provide a compelling interest independent of any interest in remedying past discrimination...." *Miller*, 515 U.S. at 921, 115 S.Ct. at 2491.

---

**61.** The three *Gingles* factors are necessary prerequisites but are not collectively sufficient to establish a § 2 violation. *DeGrandy*, 512 U.S. at 1011–12, 1013–14 & n. 10, 114 S.Ct. at 2657,

2658 & n. 10 (*citing Baird v. Consolidated City of Indianapolis*, 976 F.2d 357 (1992), *cert. denied* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993)).

The Supreme Court has nonetheless recognized a distinction "between what the [Voting Rights Act] permits, and what it requires." *Shaw*, 509 U.S. at 654, 113 S.Ct. at 2830. Based upon this distinction, the Supreme Court has concluded that "compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." *Miller*, 515 U.S. at 921, 115 S.Ct. at 2491 (*citing Shaw*, 509 U.S. at 652–56, 113 S.Ct. at 2830–31). This rule is based upon the fundamental precept that "the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law." *Voinovich*, 507 U.S. at 156, 113 S.Ct. at 1156 (*citing Growe*, 507 U.S. at 39–41, 113 S.Ct. at 1084).

■ Where a violation of the Voting Rights Act has been established, a race based remedy may be appropriate. In *Shaw*, the Court recognized that a significant state interest exists in eradicating the effects of past racial discrimination, provided the State has a "strong basis in evidence for concluding that remedial action [is] necessary." *Shaw*, 509 U.S. at 656, 113 S.Ct. at 2831–32 (citations omitted); *see also Miller*, 515 U.S. at 922, 115 S.Ct. at 2491 ("When a state governmental entity seeks to justify race-based remedies to cure the effects of past discrimination, we do not accept the government's mere assertion that the remedial action is required. Rather, we insist on a strong basis in evidence of the harm being remedied."). This compelling state interest extends to remedying past or present violations of federal statutes intended to eliminate discrimination in specific aspects of life. *See Quilter*, 912 F.Supp. at 1019–20 (*citing Croson*, 488 U.S. at 500, 109 S.Ct. at 725; *Wygant*, 476 U.S. at 274–75, 106 S.Ct. at 1846–47); *accord Shaw*, 861 F.Supp. at 437.

In this case, the *Hastert* court had a strong basis both for finding a Section 2 violation and for adopting a redistricting plan that remedied that violation. In this regard, the *Hastert* court cited with approval prior judicial determinations that found a definite pattern and practice of electoral discrimination against the Hispanic community in the City of Chicago and the State of Illinois.[62] The *Hastert* court further found that this historical discrimination against the Hispanic community was on-going, most visibly in the racial bloc voting that effectively limited the Hispanic community to a disproportionately small number of elected Hispanic officials at the city and state-levels and more subtly in the social and economic discrimination that adversely affected effective political participation and representation. Under these circumstances, the creation of an Hispanic majority district advanced the state's compelling interest of remedying past electoral discrimination against Hispanics. However, the redistricting plan adopted by the *Hastert* court has served more than a remedial role: hindsight reveals that it has protected the Hispanic community since 1991 from the invidious effects of racial bloc voting that, regrettably, retains its chokehold on the Chicago electorate. Accordingly, this court concludes that the remedy adopted by the *Hastert* court to redress an established Section 2 violation served, and continues to serve, compelling state interests.

■ In reaching this conclusion, the court drew an important distinction between using a race-based remedy to redress demonstrable injuries from specific, discriminatory electoral practices as opposed to redressing the effects of more generalized discrimination. In *Miller*, for example, the Supreme Court concluded that Georgia's Eleventh Congressional District was not required by the Voting Rights Act but instead was creat-

---

**62.** As previously observed in footnote 21 *supra*, aligning the *Hastert* parties along partisan political lines resembled a partisan division highly reminiscent of the state legislature. The parties' bipartisan agreement that an Hispanic majority district needed to be created under § 2 was thus an important acknowledgement, tantamount to an "official" concession, that the then existing electoral practices and procedures, combined with historical and social conditions, caused a dilution of Hispanic voting power in violation of § 2. The parties' bipartisan agreement as to the nature and configuration of the Hispanic majority district was an equally important acknowledgement/tacit concession that remedying the discriminatory effects of that vote dilution served a compelling interest.

ed in response to the Department of Justice's tactical withholding of Section 5 preclearance approval. The DOJ's "black-maximization" policy that forced the Georgia legislature into creating the majority-minority Eleventh Congressional District was not based on any demonstrated minority vote dilution under Section 2 or retrogression under section 5; as such, the Eleventh Congressional District was not created in response to a particularized, proven injury. Instead, the DOJ's "black-maximization" policy may only be viewed as an effort to redress the generalized effects of prior discriminatory practices. In contrast, the *Hastert* court adopted the Fourth Congressional District to remedy a proven Section 2 violation. The injuries resulting from the dilution of the Hispanic voting power were clear and present. The nature and extent of the Voting Rights Act violation are thus important factors in the calculus of considerations analyzed to determine whether a race-based remedy serves a compelling state interest.

## C. The Court–Ordered Redistricting Plan is Narrowly Tailored

■ The final prong of the strict scrutiny analysis requires this court· to determine whether the Fourth Congressional District as adopted by the *Hastert* court is narrowly tailored. The focus of this inquiry is whether the means chosen to accomplish the compelling state interest are specifically and narrowly framed to accomplish that purpose. *See Wygant,* 476 U.S. at 280, 106 S.Ct. at 1850. Alternatively stated, the question is whether in configuring the Fourth Congressional District, race was taken into account to a greater degree than necessary to further a compelling state interest.[63] *Shaw,* 861 F.Supp. at 408.

The Supreme Court has not established any standards for evaluating whether a racially based redistricting plan is narrowly tailored, except to state that "[a] reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary

to avoid retrogression." *Shaw,* 509 U.S. at 655, 113 S.Ct. at 2831. As a result, federal district courts have employed differing standards to determine whether a racially based redistricting plan is narrowly tailored. *Compare Shaw,* 861 F.Supp. at 444–56; *Quilter,* 912 F.Supp. at 1020–23, *with Vera,* 861 F.Supp. at 1343 & n. 44.

■ This court, however, does not need to take sides in this dispute. Its task is to determine whether a *court-ordered* reapportionment plan is narrowly tailored. As such, it must defer to *Hastert* court's discretion in selecting an appropriate remedy. *See United States v. Paradise,* 480 U.S. 149, 183–85, 107 S.Ct. 1053, 1073–74, 94 L.Ed.2d 203 (1987). As the Supreme Court explained,

> In determining whether this order was 'narrowly tailored,' we must acknowledge ·the respect owed a district judge's judgment that specified relief is essential to cure a violation of the Fourteenth Amendment. A district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. . . .

*Id.* at 183, 107 S.Ct. at 1073 (citation omitted). The Court further acknowledged that it has not required in all situations that remedial plans "be limited to the least restrictive means of implementation. We have recognized that the choice of remedies to redress racial discrimination is a 'balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court.'" *Id.* (citations omitted).

■ There is no evidence that the *Hastert* court abused its discretion. Prior to adopting a remedial plan, the court subjected the proposed plans to an exacting constitutional review and determined which plan would provide a better, more complete remedy for the Section 2 violation. In addition, the remedial plan it adopted was properly proportioned to the nature of the violation. That is, the court adopted a single majority-

---

**63.** "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Wygant,* 476 U.S. at 280, 106 S.Ct. at 1850 (*quoting Fullilove v. Klutznick,* 448 U.S. 448, 537, 100 S.Ct. 2758, 2805, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting)).

minority district which was limited in size to the minimum number of Hispanic residents generally believed necessary to counteract the effects of racial bloc voting and ensure that the Hispanic electorate had a reasonable opportunity to elect a candidate of its choice. It further determined that the district's extraordinary configuration was required to preserve shared communities of interest and protect the three African–American supermajority districts against impermissible retrogression. Under these circumstances, this court defers to the *Hastert* court's bal-

ancing of these concerns and concludes that it adopted a narrowly tailored plan. Where the drawing even of irregular lines is required to remedy established violations of the Voting Rights Act, the court need not flinch from its obligation to do so with a bold and deliberate pen. Accordingly, the Fourth Congressional District passes constitutional muster.[64]

WHEREFORE, for the foregoing reasons, this court concludes that the Fourth Congressional District is constitutional.

---

64. King's Motion for a Preliminary Injunction is therefore denied.

618

APPENDIX A

The Fourth Congressional District